PER CURIAM.
The defendant, Independent Life and Accident Insurance Company (“Independent Life”), appeals from a judgment based on a jury verdict in favor of the plaintiff, Maggie Harrington, in a fraudulent suppression action. We affirm conditionally.
I. Facts
Independent Life is a home service insurance company that markets various health and hospitalization policies. These policies have different age termination provisions; certain types of policies terminate when the insured reaches age 65 or becomes eligible for Medicare, while others reduce benefits by half when the insured reaches age 65 and *894 then terminate benefits altogether when the insured reaches age 70.
In 1964, Independent Life decided to waive the termination provisions in some of its existing and newly issued hospitalization policies so as to allow the policies to remain in effect even after they were due to terminate because of the insured’s age, as long as the insured continued to pay the premiums. The company drafted “Form 910,” a written endorsement document that provided:
“Any reference, contained in the Policy to which this is attached, to a reduction of Benefits at Age 65 and/or cancellation at Age 70 is herewith deleted.
“IN WITNESS WHEREOF, the Independent Life and Accident Insurance Company has caused this Endorsement to be signed by its Secretary-Treasurer at its Home office in Jacksonville, Florida.”
Independent Life filed Form 910 with the Alabama Insurance Department and thereafter directed all agents to send issued policies containing an age termination provision to the home office; if the policy was eligible for the endorsement, Independent Life would attach a separate copy of Form 910 to the policy and send it to the insured.
After 1973, Independent Life endorsed its policies by stamping a computer-generated endorsement across the faee of the policy document, above the age termination provision. The computer endorsement stated: “The Termination of Policy clause below is hereby voided.” Independent Life, however, failed to paper-endorse a substantial number of qualified policies it had issued before 1973 and failed to computer-endorse a substantial number of policies it issued during and after 1973. Insureds who had unendorsed policies would often continue to pay premiums even after they reached the age of 65 or became eligible for Medicare, oblivious to the termination provision, and Independent Life would maintain their policies. In some instances, however, insureds eventually noticed the termination provision in their policies and were alarmed to think that they had been paying premiums on a policy that, for all they knew, had terminated. If an insured then wrote a letter to the Independent Life home office and requested a refund of premiums paid after the time the policy supposedly terminated, Independent Life would issue the refund even though the company had maintained the policy. If the insured requested the refund from his Independent Life agent, however, the company usually did not refund the premiums; instead, the agent would explain that the policy should have had an endorsement and would remain in force as long as the premiums were paid.
In March 1975, Vonnie Casey bought a “Plan 859 Hospital and Surgical Indemnity Insurance Policy” from Independent Life. Casey, a functionally illiterate domestic worker, already owned a number of Independent Life policies insuring her life and the lives of her husband and her five children. Plan 859 was particularly suited to Casey because it was an “industrial” policy; such a policy features small premiums, which are collected weekly or every two weeks by Independent Life agents, and provide modest coverage for people who cannot afford a lump-sum, annual premium or who work in jobs that do not offer them group insurance.
Casey’s Plan 859 policy contained the following termination provision:
“All coverage under this Policy shall automatically terminate on the day before the date that the Insured first becomes eligible for coverage under Title XVIII of the Social Security Act (commonly called ‘Medicare’) as amended or as hereinafter [sic] amended.”
Although it was issued after 1973, Casey’s policy was not computer-endorsed with a waiver of this termination provision, nor did she ever receive a Form 910 paper endorsement.
Casey’s Independent Life agent visited her weekly to collect premiums on her policies and collected premiums for the Plan 859 policy every two weeks. In 1985, D.C. Chaf-fin became her debit agent and regularly collected the premiums due on her various policies. Chaffin never saw Casey’s Plan 859 policy and did not know that it contained a termination provision or that the policy was supposed to be endorsed with a waiver of this provision. In 1982, Casey reached age 65 and applied for Supplemental Security In *895 come (“S.S.I.”). As a result of receiving S.S.I., Casey enrolled in the Medicaid program and Part B of the Medicare program. (The Medicaid program would cover inpatient hospital care, and Part B of the Medicare program would cover outpatient care.) Although her Plan 859 policy had never been computer- or paper-endorsed, Casey continued to pay her weekly premiums to Chaffin.
In 1990, H.E. Sorrells replaced Chaffin as Casey’s collecting agent. Like Chaffin, Sor-rells never saw Casey’s policy and knew nothing of the termination provision or of the endorsement that waived it. He did not know Casey’s age. He also did not know that she was covered by Medicare and Medicaid programs and that these programs had a bearing on the effectiveness of Casey’s policy coverage.
In early 1991, Casey was hospitalized for 32 days, suffering from heart disease. After she was released from the hospital, Casey asked Sorrells to gather her bills from the hospital so that she could compile them and file a claim for benefits under her Plan 859 policy. When Sorrells went to the hospital to collect the bills, he learned for the first time that Casey was eligible for Medicaid and Medicare. The hospital, unaware that Casey had insurance, had already submitted her bills to Medicaid; it noted on her record that any future payments made to the hospital from Independent Life would be assigned to Medicaid as reimbursement.
On his next weekly visit to Casey, Sorrells informed her that Medicaid had paid her hospital bills and that any policy benefits she would receive from Independent Life would be assigned directly to the Medicaid agency as reimbursement. Sorrells did not know, however, that Medicaid covers only 14 days of hospital care annually. On Sorrells’s advice, Casey decided that it would be pointless to file a claim for benefits that would not be paid to her and to maintain a hospitalization policy that would only duplicate the benefits she now expected to receive from Medicaid. Sorrells advised Casey not to file a claim and to cancel her Plan 859 policy, and she followed his advice.
Medicaid thereafter paid for 14 days of Casey’s hospital care, but denied payment for the remaining 18 days. Casey was hospitalized again in late 1991 and twice in early 1992, but Medicaid denied Casey’s claims for the expenses incurred for these hospital stays. It is undisputed that Casey’s Plan 859 insurance policy would have paid these expenses if Casey had not canceled it after her first hospital stay.
On March 24, 1991, Yonnie Casey sued Independent Life and its agents, alleging fraudulent suppression. Specifically, she alleged that Independent Life had suppressed the following facts: (1) that she could have received a refund of her premiums paid since reaching age 65 if she had made a request to the home office of Independent Life, (2) that her policy would not pay benefits to her if she was hospitalized, and (3) that endorsements had been prepared by Independent Life, for attachment to her policy, waiving the termination of benefits provision of her policy. She claims that the suppression of these facts induced her to purchase and maintain premiums upon a hospitalization policy that afforded her no coverage.
Casey died while the case was pending, and Maggie Lou Harrington, as administra-trix of Casey’s estate, was substituted as the plaintiff. The jury returned a verdict in favor of Chaffin and Sorrells, the agents. However, it returned a general verdict against Independent Life and awarded Harrington damages of $6,230,000. Independent Life moved for a J.N.O.V., a new trial, or a remittitur, arguing that the evidence did not support Harrington’s claims. The trial court denied the J.N.O.V. motion and the new trial motion and, after a hearing pursuant to this Court’s directive in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), denied the motion for a remittitur. Independent Life appeals, raising 12 issues.

II. Issues

Issue 1: The denial of a J.N.O.V.

Independent Life contends that it was entitled to a J.N.O.V. because, it argues, Casey did not present sufficient evidence to support her claim of fraudulent suppression. In Industrial Chemical & Fiberglass Corp. v. *896 Chandler, 547 So.2d 812, 820 (Ala.1988), this Court stated:
“The standard of review applicable to a motion for JNOV is identical to the standard used by the trial court in granting or denying the motion initially. Turner v. Peoples Bank of Pell City, 378 So.2d 706 (Ala.1979). Thus, when reviewing the trial court’s ruling on the motion, we determine whether there is sufficient evidence below to produce a conflict warranting jury consideration. Baker v. Chastain, 389 So.2d 932 (Ala.1980). And, like the trial court, we must view any evidence below most favorably to the nonmovant. Pitch v. Waldrop, 428 So.2d 1 (Ala.1982).”
Therefore, a motion for J.N.O.V. should be granted only when “the evidence, when viewed in a light most favorable to the non-movant, shows that the verdict was ‘plainly and palpably wrong and unjust.’” Attalla Golf & Country Club, Inc. v. Harris, 601 So.2d 965, 970 (Ala.1992) (quoting Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala.1990).
This Court wrote in Soniat v. Johnson-Rast & Hays, 626 So.2d 1256 (Ala.1993):
“In order to establish fraudulent concealment, a plaintiff must show (1) that the defendant had a duty to disclose a material fact; (2) that the defendant either failed to disclose or concealed that material fact; (3) that the defendant’s failure to disclose or his concealment of that material fact induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered damage as a result of his action, or inaction, induced by the defendant’s failure to disclose or his concealment of the material fact.”
626 So.2d at 1258-59.
Harrington offered proof that Independent Life suppressed three facts. However, because we hold that there was sufficient evidence to support Casey’s claim that Independent Life suppressed the fact that she was due a refund of the premiums she paid after she reached age 65, we need not discuss the suppression of all three facts.
This Court has recognized that “[a] duty to speak” can arise from “the relation of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances.” Berkel & Co. Contractors, Inc. v. Providence Hospital, 454 So.2d 496, 505 (Ala.1984) (quoting Jim Short Ford Sales, Inc. v. Washington, 384 So.2d 83, 86 (Ala.1980), in turn citing Hall Motor Co. v. Furman, 285 Ala. 499, 234 So.2d 37 (1970)). In addition, this Court has emphasized that where one party has superior knowledge of a fact and the other party’s having the same knowledge would cause the other party to take a different course of action, then a duty to disclose arises, if the other party cannot discover the fact himself. Interstate Truck Leasing, Inc. v. Bender, 608 So.2d 716 (Ala. 1992).
In Bender, Interstate Truck sued Bender and another defendant, alleging fraudulent suppression of a material fact. Interstate Truck contended that the defendants had failed to disclose that the property leased to it was the subject of a pending condemnation proceeding. 608 So.2d at 718. The trial court entered a summary judgment for the defendants on the fraudulent suppression claim. Id. This Court reversed, stating:
“Where one party has knowledge of a fact and the other party is being induced to take action that he would not take if he also had that knowledge, an obligation to disclose arises. Dominick v. Dixie Nat’l Life Insurance Co., 809 F.2d 1559 (11th Cir.1987). Here, it is uncontroverted that Interstate would not have entered into the lease and invested in improvements on the property if it had known of the State’s plan to build an overpass on it. Further, the evidence indicates that Interstate could not have discovered the impending condemnation through due diligence and, thus, that it was placed in an unequal bargaining position during negotiations for the lease. If a plaintiff offers evidence of special circumstances suggesting that the defendant should have disclosed certain material facts, then whether the defendant had a duty to communicate these facts is for the jury to determine. Lowder Realty, Inc. v. Odom, 495 So.2d 23 (Ala.1986).”
608 So.2d at 720.
Independent Life had knowledge of its refunding policy that it failed to disclose. Its *897 failure to disclose this refunding policy caused injury to Casey. Casey was not an astute businesswoman and was relying on the agent Sorrells to inform her about her policy. Independent Life informed neither Casey nor Sorrells about its informal refunding policy, as evidenced by Sorrells’s testimony that his staff manager had previously told him that premiums paid after age 65 could not be refunded. This evidence indicates that Independent Life had superior knowledge and that Casey was not in a posture where she knew or should have known of the refunding policy.
Further, the evidence supports a finding that Independent Life breached its duty to disclose and thereby caused Casey to be injured. Independent Life failed to disclose that Casey could receive a refund of her premiums. It did not communicate to either Casey or Sorrells that upon termination of the policy Casey could receive a refund of the premiums she had paid after reaching age 65. The evidence further demonstrates that Independent Life communicated its refunding policy only to those insureds who inquired directly about its refunding policy. Independent Life never told those insureds, like Casey, who relied heavily on an agent’s knowledge, about its refunding policy. Because there is sufficient evidence that Independent Life failed to disclose a fact that it had a duty to disclose and that that failure to disclose caused Casey to be injured by forgoing the return of her premiums, the trial court correctly denied Independent Life’s motion for J.N.O.V.

Issue 2: The refusal to charge the jury on the issue of waiver.

Independent Life argues that by accepting Casey’s premiums after the termination date, it waived its right to terminate the policy and that that waiver was a defense to Casey’s claim that it had suppressed the fact that her policy was not in effect. As discussed above, the relevant fraudulent suppression claim is that Independent Life suppressed the fact that Casey could have received a refund of her premiums, not that Independent Life suppressed the fact that Casey’s policy was not in effect. The waiver defense is not pertinent to the claim that Independent Life suppressed the fact that Casey was entitled to a refund of the premiums. Thus, having determined that the evidence was sufficient to support a fraudulent suppression claim— specifically, the claim that Independent Life suppressed the fact that Casey could receive a refund of her premiums — we pretermit further discussion of the waiver issue.

Issue 3: The charge on the duty to disclose.

Independent Life contends that the trial court did not allow the jury to decide whether Independent Life had a duty to disclose certain facts to Casey and that it erred by not doing so. It argues that the trial court erred by instructing the jury that withholding any significant fact that the insured would want to know would constitute suppression. However, the trial court did submit to the jury the issue of a duty. The trial court gave an instruction quite similar to instruction 18.08 found in Alabama Pattern Jury Instructions: Civil (1992 Supp.). The court stated:
“The plaintiff contends that each defendant was guilty of a legal fraud because the defendant concealed or withheld material facts from the plaintiff, and here I am talking about Mrs. Casey, and without knowledge of such material fact or facts the plaintiff, here Mrs. Casey, acted to her injury.
“The defendants each deny those allegations and the burden is upon the plaintiff, now Mrs. Harrington, to reasonably satisfy each member of the jury from the evidence of the truthfulness of each of these sub-parts or other material, and they are all material allegations or elements. The defendant had a duty to disclose a material fact that the defendant concealed or withheld one or more material facts from the plaintiff to induce the plaintiff, we are talking here about Mrs. Casey, to act that without knowledge of such material fact or facts the plaintiff, here Mrs. Casey, acted to her injury.
“In determining whether any defendant was under a duty to disclose or communicate or in some way convey a material fact the jury may consider the value of the *898 particular fact involved, the relative knowledge of the parties, any inequality of the condition of the parties, the relative bargaining position of the parties and whether the defendant, whichever one you are talking about, has some particular knowledge, means of knowledge or expertise not shared by the plaintiff.”
A trial court must instruct the jurors fully and correctly on the applicable law of the case. American Cast Iron Pipe Co. v. Williams, 591 So.2d 854 (Ala.1991). This instruction appropriately informed the jury as to what it could consider in determining whether the defendants had a duty to disclose a material fact.

Issue ⅛,: The refusal to rule as a matter of law that Casey’s policy was not a Medicare supplement policy.

Independent Life argues that the trial court erred in refusing to rule as a matter of law that Casey’s policy was not a Medicare supplement policy. It argues that, although the policy mentioned Medicare, it was not a Medicare supplement policy and that the trial court should have instructed the jury of that fact. However, the expert testimony given at trial was in sharp dispute as to whether Casey’s policy was in fact a Medicare supplement. It is well settled that conflicting evidence presents a question for the jury. See Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990). Because that fact issue was disputed, the trial court properly submitted it to the jury.

Issue 5: The admission of testimony concerning premium amounts.

Independent Life contends that the trial court erroneously admitted into evidence testimony given by Casey’s expert, Robert Hershbarger, regarding the average premium paid by an Alabama insured for an industrial hospital policy. It maintains that Hershbarger’s testimony about the total amount of premiums Independent Life received from insureds holding these hospital policies was speculative and was not supported by the evidence.
However, we find that the testimony was based upon such unquestioned facts as the amount of premiums paid by Casey and by Eguel Belk, another Alabama insured whose industrial hospital policy lacked an endorsement; the total number of Alabama-sold industrial hospital policies represented by Independent Life as containing a termination provision; and the percentage of national sales that Alabama sales represented. Further, even though Hershbarger’s computations of the average premium paid by an Alabama insured on these policies and the total amount of premiums received by Independent Life from these insureds were approximations, any challenge to the facts upon which he based his computations goes to the weight to be given the testimony, not to its admissibility. Baker v. Edgar, 472 So.2d 968 (Ala.1985). Thus, the trial court correctly admitted the testimony relating to premium payments.

Issues 6 and 7: The admission of other Alabama policies and other nationwide policies.

Independent Life argues that the trial court erroneously admitted into evidence 14,062 hospital policies sold in Alabama. It contends that these policies were not relevant because, it says, they were not similar to Casey’s policy. However, the power to decide whether evidence is to be excluded upon relevancy grounds is within the sound discretion of the trial judge. C. Gamble, McElroy’s Alabama Evidence, § 21.01(6) (4th ed. 1991). In Allstate Insurance Co. v. Hilley, 595 So.2d 873 (Ala.1992), this Court reiterated this principle:
“ ‘The trial court has wide latitude in regard to testimony [evidence] in fraud cases because often the perpetrator is the sole possessor of the actual knowledge of the fraud. The trial court’s rulings will not be disturbed on appeal unless that discretion has been abused.’ ”
Id. at 877 (quoting Sessions Co. v. Turner, 493 So.2d 1387, 1391 (Ala.1986)). The record does not indicate an abuse of discretion.

Issue 8: The admission of testimony concerning loss ratios.

Independent Life maintains that the expert’s opinion on loss ratios should not *899 have been admitted because, it says, the ratios had no relationship to the facts in this case. It contends that because the court failed to rule as a matter of law that Casey’s policy was not a Medicare supplement policy, the court erroneously admitted irrelevant testimony of the loss ratios required by Medicare supplement policies.
However, as discussed in regard to Issue 4, because the expert testimony given at trial was in sharp dispute as to whether Casey’s policy was in fact a Medicare supplement policy, the trial court correctly submitted this issue to the jury. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412. Further, Regulation 71 of the Alabama Insurance Department Regulations requires that Medicare supplement policies maintain a loss ratio of 65 percent. That is, for every dollar the insurer collects in premiums, it has to pay out 65 cents in benefits. Thus, this loss ratio would be especially relevant if the policy was found to be a Medicare supplement policy. We note that in National States Insurance Co. v. Jones, 393 So.2d 1361 (Ala.1980), this Court affirmed the trial court’s admission of evidence regarding loss ratios, holding that that evidence was relevant to the issue of fraud.

Issue 9: The verdict for Sorrells and Chaffin but against Independent Life.

Independent Life contends that the jury verdict was inconsistent because the jury did not find that its agents, Sorrells and Chaffin, had fraudulently suppressed a material fact, but found that it had. It asserts that Harrington failed to make out a prima facie case of suppression against Independent Life because, it argues, the evidence indicated that it, like its agents, had no actual knowledge of the facts alleged to have been suppressed. However, the record indicates that Independent Life was plainly aware of its own refunding policy, which is the relevant fact in the suppression allegation.
Sorrells, the defendant former agent dealing with Casey, testified that his district manager told him that premiums paid after the insured reached age 65 could not be refunded. Ken Strasen, an Independent Life executive, testified that premiums paid after the insured reached age 65 could be refunded. Thus, the jury could reasonably infer from Sorrells’s testimony that agents of Independent Life were not aware of the refunding policy. However, the jury could also reasonably infer from Strasen’s testimony that Independent Life was aware of the refunding policy. A principal cannot escape liability merely by failing to inform its agent of the facts. Bolton Ford of Mobile, Inc. v. Little, 344 So.2d 1208 (Ala.1977). Given these facts, we conclude that the jury’s verdict was not inconsistent.

Issue 10: The instruction, or failure to instruct, that the jury must find proximate causation of injury in order to award punitive damages.

Independent Life claims that the trial court failed to instruct the jury that it was necessary to find that Independent Life proximately caused injury to Casey before it could award punitive damages. It contends that in its charge the trial court interchanged the terms “suppression” and “fraud” and thereby instructed the jury that Harrington needed only to prove the concealment aspect of the suppression claim, but not causation or injury, to recover punitive damages. However, considering the instructions as a whole, we hold that the trial court’s instruction sufficiently explained that the plaintiff had to prove causation and injury. The court explained to the jury the elements of the fraudulent suppression claim, stating:
“Now, there are going to be parts to these, but there are three basic, let us say, material allegations or elements. The first is suppression. The next is proximate cause, and the last is damages. I am going to fully explain all of those things to you.
“Now, I told you that the next material allegation or element was that of proximate cause. When we say that something proximately resulted, of course, that has a legal meaning. We use the word that something proximately caused damages.
“A proximate cause is an actual cause. It is that cause which in the usual and normal turn of events, without some independent intervening cause coming in, produces the damages which are claimed in the suit.”
*900 When examining a charge asserted to be erroneous, this Court looks to the entirety of the charge to see if there is reversible error. Shoals Ford, Inc. v. Clardy, 588 So.2d 879 (Ala.1991). A review of the charge in its entirety demonstrates that the court properly instructed the jury that, in order to recover, Harrington had to prove suppression, proximate cause, and damage.

Issue 11: The instruction on the relationship between the punitive damages award and the fraudulent suppression claim.

A. Intentional acts versus negligent acts.

Independent Life asserts that the trial court instructed the jury that it could award damages for any conduct that it considered wrongful, not just for the conduct of suppression. Independent Life contends that because evidence of other wrongful acts, not just suppression, was presented, the jury could have awarded damages for negligent acts not at issue in this case. It maintains that the instruction was prejudicially vague and misleading.
However, we conclude that the trial court’s instruction was not vague or misleading. The trial court instructed the jury that the purpose of punitive damages is to protect the public by deterring the defendant and others from doing such wrong in the future, and that in awarding punitive damages the jury should consider the “character and degree of wrong” and the “necessity of preventing similar wrongs.” Further, it stated,
“For a plaintiff to be entitled to recover punitive damages the plaintiff, Mrs. Harrington, must prove by clear and convincing evidence that the defendant consciously or deliberately engaged in fraud, and I have defined that to you. That is suppression as I have defined that to you.”
(Emphasis added.)
We hold that this instruction properly informed the jury that the only claim for which the plaintiff was entitled to recover damages was the claim of fraudulent suppression. Further, we hold that the trial court’s charge on the requisite finding of intent was enough to allow an award of punitive damages.

B. The refusal to instruct the jury that there must be a proportionality between punitive damages and compensatory damages.

Independent Life argues that the trial court erred by failing to instruct the jury that the amount of a punitive damages award must bear a reasonable relationship to compensatory damages. However, in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), this Court held that although punitive damages must not exceed an amount that will accomplish the goals of punishment and deterrence, they need not bear a particular relationship to compensatory damages. See also Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); Southern Life & Health Ins. Co. v. Turner, 586 So.2d 854 (Ala.1991); TXO Production Corp. v. Alliance Resources Corp., 509 U.S. -, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Thus, we hold that the trial court did not err in refusing to give an instruction requiring a proportionality between punitive damages and compensatory damages.

Issue 12: The punitive damages award and the trial court’s Hammond order.

As noted previously, the jury returned a general verdict awarding damages of $6,230,000. The trial court denied Independent Life’s request for a separate verdict form for punitive damages. Thus, the jury’s general verdict did not state what portion of the award represented compensatory damages and what portion represented punitive damages.[1] The plaintiff’s counsel did not ask *901 the jury for a specific amount of compensatory damages for Casey’s economic loss and mental anguish, but did request a punitive damages award of $17 million. Even given Casey’s economic loss of approximately $1,200 in premiums she paid after her 65th birthday, plus interest, and additional compensatory damages for her mental anguish relating to the belief that her Independent Life policy had terminated, the jury’s award may represent $6 million or more in punitive damages.[2]
Independent Life first argues that the punitive damages award is excessive as a matter of law, because, it contends, the verdict represents a punitive/compensatory ratio of 4996:1, considering Casey’s $1,200 economic loss. Thus, Independent Life argues that the punitive damages award does not bear a reasonable relationship to the compensatory damages award. However, we note that the actual ratio of punitive to compensatory damages awarded by the jury is very likely less than 4996:1 because the jury may have awarded compensatory damages for Casey’s mental anguish. Moreover, this Court has consistently rejected the argument that an award of punitive damages is excessive if it does not fall within a certain arbitrary ratio in regard to the compensatory damages award. Southern Life & Health Ins. Co. v. Turner, 586 So.2d 854 (Ala.1991); Nationwide Mut. Ins. Co. v. Clay, 525 So.2d 1389 (Ala.1987), cert. denied, 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 988 (1989). See also, TXO Production Corp. v. Alliance Resources Corp., 509 U.S. -, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).
Independent Life argues that the trial court’s review of the jury verdict, required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), failed to properly analyze the factors set forth in Hammond and in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and, thus, did not subject the punitive damages award to a “meaningful review,” as the United States Supreme Court has held is mandated by constitutional due process provisions. Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). However, a jury’s verdict bears a presumption of correctness,[3] and a motion for a new trial based on alleged ex-cessiveness of the punitive damages award will be granted only if the court determines that the award is the result of “passion, bias, corruption or other improper motive.” Hammond, supra, at 1378.
We stated in Hammond that in reviewing a jury verdict to determine whether it is unconstitutionally excessive, the trial judge should consider the following factors: (1) “[t]he culpability of the defendant’s conduct”; (2) “the desirability of discouraging others from similar conduct”; and (3) “the impact [of the verdict] upon the parties.” Id. at 1379. Thereafter, in Green Oil, we listed seven factors that a trial court could consider when reviewing whether a punitive damages award was excessive or inadequate. The Green Oil factors encompass and expand on the Hammond factors, and include: (1) the relationship of the punitive damages award to the harm that has actually occurred and is likely to occur because of the defendant’s misconduct (it must be a reasonable relationship); (2) the “reprehensibility of the defendant’s conduct”; (3) the profit gained by the defendant because of its misconduct; (4) the defendant’s “financial position”; (5) “the costs of litigation”; (6) “criminal sanctions *902 ... imposed on the defendant [because of the same] conduct”; and (7) “other civil actions against the same defendant, based on the same conduct.” Green Oil, 539 So.2d at 223-24.
In addition, Ala.Code 1975, § 6-ll-23(b), mandates that the trial court consider additional factors when reviewing a punitive damages award: (1) the economic impact of the verdict on the defendant or on the plaintiff; (2) the size of the compensatory damages award;[4] (3) whether the defendant has previously been guilty of the same misconduct; and (4) any effort on the part of the defendant to remedy the wrong complained of and the opportunity to do so. With the exception of the last factor regarding the defendant’s remedial efforts, these statutory factors appear to be encompassed within the Green Oil factors. Thus, a trial court’s Hammond order discussing a punitive damages award must include a review of all the factors listed in Hammond, Green Oil, and § 6-ll-23(b), to the extent that they are not redundant, and should also include any additional factors the court finds meaningful in the particular case.
As noted by the United States Supreme Court in Haslip, the trial court’s Hammond ruling is subject to this Court’s review on appeal, which “ensures that punitive damages awards are not grossly out of proportion to the severity of the offense.” Haslip, 499 U.S. at 22, 111 S.Ct. at 1045. In addition to the fact that this Court uses the same factors the trial court uses in reviewing a punitive damages award, this Court has stated that “the constitutionality of Alabama’s punitive damages law rests, in part, on this Court’s use of comparative analysis during judicial review of a punitive damages award.” BMW of North America v. Gore, 646 So.2d 619, 628 (Ala.1994). See Haslip, supra. Comparison of the verdict in the ease being reviewed with verdicts in other similar cases is helpful in maintaining consistency in punitive damages awards. However, as we emphasized in Gore, the use of a comparative analysis is not intended to replace judicial review utilizing the Green Oil factors, but is only one step in the process of judicial review.
Finally, we note that all the factors listed above, and any other factors that might be used in judicial review of a punitive damages award, arise from the same central concept— that the purpose of punitive damages is “to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future.” Green Oil, 539 So.2d at 222. Accordingly, we undertake a review of the punitive damages award against Independent Life.

A. Reasonable relationship to the harm that has actually occurred and the harm that is likely to occur.

In Green Oil, this Court stated: “If the actual or likely harm is slight, the [punitive] damages should be relatively small. If grievous, the [punitive] damages should be much greater.” 539 So.2d at 223. In this ease, the trial court’s Hammond order concluded that the harm caused by the defendant’s wrongful conduct was grievous. On appeal, Independent Life argues that the trial court erred in reaching that conclusion. Specifically, it contends that the trial court improperly considered the harm potentially caused by the total number of similar policies written outside Alabama, failed to acknowledge evidence that many Alabama policyholders had suffered no harm, and incorporated into its ruling certain allegations of wrongful conduct on the part of Independent Life that were not at issue in the trial.
First, Independent Life argues that the punitive damages award should be remitted because, it contends, the trial court erred in admitting evidence of the number of policies similar to Casey’s issued by Independent Life nationwide, rather than only in Alabama, and that the trial court compounded that error by using the nationwide figure in its Hammond order to uphold the $6,230,000 verdict. In reviewing this Hammond factor, *903 the trial court noted: “The evidence was that defendant does business in many states in the United States, with some 69,203 similar policies in effect, 10,618 of those policies in Alabama.”
Regarding evidence of a defendant’s conduct in other jurisdictions, this Court has previously stated:
“Although evidence of similar acts in other jurisdictions is admissible as to the issue of a ‘pattern and practice’ of such acts, ... this jury could not use the number of similar acts that a defendant has committed in other jurisdictions as a multiplier when determining the dollar amount of a punitive damages award. Such evidence may not be considered in setting the size of the civil penalty, because neither the jury nor the trial court had evidence before it showing in which states the conduct was wrongful.”
Gore, supra, at 627.
The fact that Independent Life had issued similar policies without proper endorsements outside Alabama, and had failed to notify policyholders, was admissible to prove that its misconduct warranted punitive damages. However, evidence of the total number of similar policies issued in other jurisdictions should not have been considered by the trial court when reviewing whether the amount of the punitive damages award was reasonable, because the jury was not presented with any evidence of the number of similar policies issued outside Alabama that were not properly endorsed or evidence that Independent Life had acted unlawfully in any other jurisdiction. Thus, we hold that the trial court erred in determining the amount of harm caused by Independent Life’s actions, to the extent that the court relied upon the number of policies of the type in question that were issued to residents of other jurisdictions, but where no unlawful conduct occurred. Gore, supra.
Next, Independent Life argues that the trial court erred in determining the actual amount of harm caused by its failure to properly endorse the policies issued in Alabama and its suppression of facts relating to those policies. Specifically, it contends that the trial court failed to note in the Hammond order that a large percentage of the policies issued in Alabama were properly endorsed; [5] thus, it says that the court failed to acknowledge that many of the Alabama policyholders had not been harmed. Independent Life also argues that the trial court failed to consider the fact that during the Hammond hearing it offered testimony that it had never denied a claim on one of the policies in question on the basis that the claimant had turned 65 and the policy was supposed to have terminated.
Third, Independent life argues that the trial court’s Hammond order did not focus solely on the fraudulent suppression for which the jury found it liable, but included discussion of conduct that was not at issue under the single cause of action involved in this case. Finally, Independent Life argues that it was improper for the trial court to consider harm to potential future policyholders, because the type of policy involved in the case is no longer sold.
Having reviewed the record of the Hammond hearing and the trial court’s written order, this Court concludes that although Independent Life’s actions warrant an award of punitive damages, the harm that has occurred and the harm that is likely to occur because of the fraudulent suppression are not as great as the trial court determined. Accordingly, this factor argues for a remittitur of the punitive damages award.

B. Reprehensibility of the defendant’s conduct.

In Green Oil, we listed several factors relevant to determining the reprehensibility of a defendant’s conduct. Those factors include: (1) the duration of the conduct, (2) the degree to which the defendant was aware that the conduct had caused or was likely to cause harm, (3) any concealment or “coverup” of the harm, and (4) the existence and *904 the frequency of similar past conduct. 539 So.2d at 223. A review of the record shows that Independent Life had the capability for at least 10 years to perform a computerized search of the type of policies in question in order to determine whether they were properly endorsed, and thereafter to endorse them, but failed to do so until a judgment was entered against it. The trial court noted that from such evidence a jury could have found an awareness of the problem on the part of Independent Life.
The trial court held that from evidence presented to the jury it could have concluded that Independent Life attempted to cover up the problem caused by the misleading language of the policies at issue and purposely failed to inform its policyholders that it would pay claims made on the policy even though the policyholder was age 65 or older, or would refund premiums paid after age 65. The trial court concluded: “This court knows of few reported decisions in Alabama where a defendant’s conduct approached the reprehensibility of this defendant’s conduct in this case, and the conduct was so pervasive and of such long standing.” We, too, conclude that from the evidence presented the jury could have reasonably found that the degree of reprehensibility of Independent Life’s misconduct was significant.

C. Efforts to remedy the wrong.

Independent Life notes that the trial court left it for this Court to determine what effect its post-verdict remedial efforts to place proper endorsements on the type of insurance policies at issue should have on the jury’s punitive damages award. The trial court’s Hammond order stated: “Whether post-verdict efforts at remedying a wrong come too late is a matter for the Supreme Court of Alabama to determine; that Court may hold that remedies are to be prompt upon discovery of the wrong and not admissible at trial (but admissible post-trial) as subsequent remedial measures.”
As noted previously, Ala.Code 1975, § 6-ll-23(b), requires a court reviewing a punitive damages award to consider whether the defendant has undertaken any effort to remedy the wrong complained of and also whether the defendant has had an opportunity to do so. Further, sound public policy dictates that the type of action taken by Independent Life — locating and properly endorsing all outstanding policies of the type in question, action that benefits a much wider class of Alabama citizens than would a monetary award to a single plaintiff — should be encouraged by this Court’s acknowledging that action as a mitigating factor in a review of a punitive damages award. However, the weight of that action as a mitigating factor in a punitive damages review would not be so great where, as in this case, the remedial action is taken only after the jury has returned a substantial punitive damages verdict.

D. Profitability to the defendant.

We have stated that the purpose of punitive damages is twofold: “to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future.” Green Oil, 539 So.2d at 222. Accordingly, punitive damages should generally exceed the amount of profit created by the defendant’s misconduct, so that the defendant recognizes a loss. See Gore, supra.
During closing arguments, the plaintiffs counsel asked the jury to award $17 million in punitive damages, an amount he contended Independent Life had received in premiums on the type of policies at issue during one year. The trial court noted in its Hammond order that, by its own calculations, Independent Life had received approximately $7 million per year in premiums on the policies at issue and that if that figure was multiplied by the number of years since 1975, when Casey purchased her policy, even if the jury’s entire award was considered to be punitive damages the award would not be excessive.
On appeal, Independent Life asserts that the profit it makes on its policies is actually much less than the amount of premiums it receives, claiming that it makes only seven cents of profit for each premium dollar it receives. Further, Independent Life contends that an internal study has revealed that with regard to policyholders age 65 or older it actually lost money on the type of policies at issue. Thus, Independent Life *905 argues that the punitive damages award is highly excessive.
In this case, we find neither the trial court’s, nor Independent Life’s, profitability calculus to be helpful. The profit to Independent Life from its fraudulent suppression of facts relating to the termination provision on the policies at question was derived from not having refunded premiums paid by policyholders after reaching age 65 and in not having paid claims by policyholders over age 65 who, like Casey, did not file a claim because they believed their policies had terminated. The amount of those potential claims is unknown and cannot be calculated from the data presented at trial or during the Hammond hearing. Thus, we note that while Independent Life did profit by its misconduct, the record contains insufficient information for us to determine whether the size of that profit weighs for or against a remittitur of the punitive damages award.

E.Financial position of the defendant.

As noted previously, punitive damages are imposed on a defendant both to punish for misconduct and to deter the defendant and others from acting similarly in the future. Green Oil, supra, at 223. Thus, the financial condition of the defendant is relevant in determining whether a punitive damages award is excessive. After having considered information regarding the financial condition of Independent Life, the trial court concluded: “The verdict will punish this defendant, but at the same time it is not so large as to unduly burden this defendant based on what information is before this court.”
Likewise, we note that Independent Life showed a profit during 1992, the year this jury verdict was rendered, even though it had set aside reserves to cover the $6,230,000 verdict. During the Hammond hearing, Independent Life stated that it had a net worth of $102,826,000. Although Independent Life argues that a $6 million punitive damages award would have an enormous impact on its financial condition, by dropping its capital surplus below the $100 million threshold and subjecting it to more restrictive regulations, we conclude that it has sufficient ability to pay a $6 million judgment without the payment’s having a significant impact on its financial condition. Thus, this factor does not weigh in favor of a remittitur of the verdict.

F. Costs of litigation.

Green Oil mandates that the plaintiffs eosts of litigation be considered when reviewing whether a punitive damages award is excessive. 539 So.2d at 223. This policy encourages bringing wrongdoers to trial. See Gore, supra. In this case, the trial court noted that the costs of litigation were significant and that this factor did not weigh in favor of remittitur. In fact, the trial court warned: “If the verdict was reduced, this court fears that there would be a chilling effect on plaintiffs and their attorneys in the future that would discourage them from bringing wrongdoers to trial.” This factor does not weigh in favor of remittitur of the punitive damages award.

G. Criminal sanctions.

No criminal sanctions have been imposed on Independent Life for the conduct that is the basis for the punitive damages award. Therefore, this factor is not applicable.

H. Other civil actions.

Independent Life has not made this Court aware of other civil actions that have been successfully maintained against it relating to the misconduct at issue in this case. Although two other civil actions may be pending, the mere existence of those actions does not suggest that the punitive damages award should be reduced.

I. Comparative cases.

In this case, Independent Life was not held liable for misconduct on the part of one of its agents, but, rather, for misconduct at the highest levels of the company. Accordingly, we have reviewed Alabama cases where punitive damages were awarded against insurance companies based on similar misconduct. This comparative review reveals that the punitive damages award in this case is somewhat excessive in relation to the *906 punitive damages awards affirmed by this Court in similar cases.

J. Conclusion on Hammond review.

After thoroughly reviewing the record, in relation to the factors discussed above, we hold that a remittitur of the punitive damages award is required. Our review of the record has revealed that Independent Life’s misconduct has not caused the widespread harm that the trial court thought it had caused or would cause. Thus, that factor argues for a remittitur of the punitive damages award. In addition, Independent Life’s post-verdict remedial efforts also warrant some mitigation of punitive damages. Finally, a comparative review of similar cases reveals that the punitive damages award in this case is somewhat excessive in relation to the awards in those cases.
After thoroughly reviewing the jury award in light of the factors discussed above, we hold that a constitutionally reasonable punitive damages award in this ease is $4,000,000 and that a remittitur of the $6,230,000 verdict is warranted.

III. Conclusion

The judgment is affirmed on the condition that Harrington file with this Court within 21 days a remittitur of damages in the sum of $2,000,000; otherwise the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.
HORNSBY, C.J., and ALMON, SHORES, HOUSTON, INGRAM and COOK, JJ., concur.
MADDOX, J., concurs in the result.

. Although Ala.Code 1975, § 6-11-1, requires that in all civil actions based on tort, the damages assessed by the factfinder must be itemized as to past damages, future damages, and punitive damages, that section is not applicable to cases where the plaintiff's right of action accrued before June 11, 1987. See Ala.Code 1975, § 6—11— 30. Because Casey turned age 65 and became eligible for Medicare in 1982 and continued to pay premiums to Independent Life while it failed to inform her that her policy terminated when she became eligible for Medicare or that she could receive an immediate refund on all premiums paid after that date, she had a cause of *901 action for continuing fraudulent suppression against Independent Life each time it accepted her policy premiums, and Casey’s cause of action first accrued before June 11, 1987. Thus, § 6-11-1 is not applicable to this case. Further, because Casey had a continuing cause of action against Independent Life, her complaint filed on May 24, 1991, was brought within the two-year statutory limitations period for fraud, which began to run in March 1991, when she made her last payment to Independent Life on the policy.

. On appeal, the plaintiffs counsel does not dispute that the $6,230,000 verdict primarily represents an award of punitive damages. Further, the plaintiff's counsel has not attempted to place a dollar figure on the size of the jury’s compensatory damages award.

. We have ruled that Ala.Code 1975, §§ 6-11-23(a), 6-ll-24(a), and parts of § 6 — 11—23(b) and § 6-ll-24(b), which stated that the factfinder’s punitive damages award was to be accorded no presumption of correctness and that the trial court was to independently assess punitive damages, are unconstitutional. Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991).

. As this Court has repeatedly noted, a punitive damages award need not fall within some mathematical ratio to the compensatory damages award. Southern Life & Health Ins. Co. v. Turner, 586 So.2d 854 (Ala.1991); Nationwide Mut. Ins. Co. v. Clay, 525 So.2d 1339 (Ala.1987). Further, a compensatory damages award is not always a prerequisite for a punitive damages award. Caterpillar, Inc. v. Hightower, 605 So.2d 1193 (Ala.1992).

. Independent Life offered into evidence, during the Hammond hearing, testimony that a random survey of approximately 200 policies held by persons over the age of 65 showed that 33 percent of the policies that should have been paper-endorsed were properly endorsed while 40 percent of the policies that should have been computer-endorsed were so endorsed.