Mark W. **GREGORY,** et al., Plaintiffs,

v.

**CHEMICAL WASTE MANAGEMENT, INC.,** Defendant.

Civil No. 93–23443–H/V.

United States District Court,
W.D. Tennessee,
Western Division.

Dec. 11, 1996.

Jef Feibelman, Burch Porter & Johnson, Memphis, TN, Joel H. Porter, Susan M. Clark, Burch Porter & Johnson, Memphis, TN, John S. Wilder, Sr., John S. Wilder & Associates, Somerville, TN, William D. Scruggs, E. Allen Dodd, Jr., William D. Scruggs, Fort Payne, AL, for plaintiffs.

G. Ray Bratton, Farris Mathews Branan & Hellen, Memphis, TN, Francis J. Higgins, Bell Boyd & Lloyd, Chicago, IL, Kenneth E. Rechtoris, Bell, Boyd & Floyd, Chicago, IL, for defendant.

## OPINION AND ORDER

HORTON, District Judge.

This action by Plaintiffs charges the Defendant with breaching two important provisions of a contract to purchase a waste disposal site near Emelle, Alabama. The two provisions allegedly violated are the quarterly payment provision, paragraph 2.1 of the contract, and paragraph 6.11, the maximization provision. Additionally, Plaintiffs also charge the Defendant with fraud, willful misrepresentation and suppression of material facts and bad faith refusal to comply with the terms and conditions of the contract. Defendant vehemently denied that it breached paragraphs 2.1 and 6.11 of the contract. Defendant denied that it, through its corporate officers, committed fraud and misrepresented or suppressed any material facts relating to any acts taken pursuant to the contract. After having answered the complaint, as amended, Defendant counter-claimed that Plaintiffs had, in fact, been overpaid on the contract. The sale/purchase contract between the parties is dated February 23, 1978. In reference to the payments, the parties often used the words percentage of revenues and royalties interchangeably.

This Court concludes the Emelle contract was entered into by all of the parties thereto guided by highly competent legal advice. All parties had their eyes wide open. All parties fully agreed and understood the revenue royalty payment terms of the contract. There was an offer. There was an acceptance. There was consideration. The fact that the revenue royalty payments due by the contract terms exceeded the highest expectations of the parties gives the Defendant no right to brainstorm a "new" contract interpretation with the intention obviously to curtail the amount of revenue or royalty payments due plaintiffs. The purchase agreement payment language is clear. The language is totally unambiguous. A promise is a promise. As between the parties to this lawsuit, an unambiguous contract promise to pay a specified percentage of all revenues must be complied with. There is no alternative.

### Introduction

During the mid-seventies, Plaintiffs developed and began operating a commercially hazardous waste disposal facility located outside of a small town known as Emelle, Alabama.[1] Defendant purchased the facility and other assets from Plaintiffs in 1977. The written purchase agreement provided that as part of the purchase price Plaintiffs would receive quarterly installment payments equal to twelve and one-half percent (12 1/2%) of all revenues from the operation of the site for twenty-one years. At the end of the twenty-one year

1. The facility is commonly known and referred to as "Emelle."

period, Plaintiffs would receive one percent (1%) of all revenue from the operation of the site throughout the facility's economically useful life. In addition, the contract obligated Defendant to operate the facility to its maximum capacity thereby maximizing plaintiffs' quarterly installments or "royalty"[2] payments.

Soon after Defendant took over operations of the site, the facility began generating a large amount of revenue—literally tens of millions of dollars yearly. Plaintiffs and Defendant, throughout the trial, referred to the site as one of the premier waste disposal sites in the United States. However, as early as 1982 and certainly no later than 1985, a decision had apparently been made by Defendant's top corporate officials to attempt in some way to limit or reduce Plaintiffs' royalty payments. Unbeknownst to Plaintiffs, Defendant began to excluded certain revenues from the royalty payment calculations based upon Defendant's unilateral re-interpretation of the contract payment language. Defendant also shifted certain waste and waste treatment processes to other related corporate entities. Moreover, Defendant abandoned its contract commitment to develop the maximum incineration capability of Emelle in favor of an incinerator development located at Defendant's Port Arthur, Texas, facility obviously attempting to limit Plaintiffs' royalty payments.

By the later part of 1992, Plaintiffs began having serious concerns about the Defendant's accounting practices relating to the royalty calculations and payments due them. These concerns were confirmed in January 1993 when Defendant informed Plaintiffs it mistakenly overpaid them in excess of eight million dollars ($8,000,000). Defendant also withheld from Plaintiffs the fourth quarter 1992 royalty payment to off set part of the alleged overpayment.

On April 7, 1993, several of the principal plaintiffs met with Defendant's chief financial officer and the chief financial officer of Defendant's parent company, Waste Management Technologies, Inc., to discuss the alleged overpayment. During this meeting, one of Defendant's representatives informed Plaintiffs that Chem Waste interpreted the 12 1/2% royalty language to apply only to "disposal revenues," i.e., revenues generated from land-filling or burying of hazardous waste, as opposed to treatment, processing and other revenues. Defendant's representative then offered to "buy-out" Plaintiffs' remaining interest in the facility for a significantly reduced amount compared to what Plaintiffs' had been receiving in quarterly installment payments.

On April 15, 1993, Plaintiffs filed this action for declaratory judgment and other relief pursuant to 28 U.S.C. §§ 2201, 2202 and Rule 57 of the Federal Rules of Civil Procedure alleging breach of contract. During the course of discovery, Plaintiffs discovered Defendant's exclusion of revenues from the royalty calculations. Accordingly, Plaintiffs were allowed to amend their complaint to include three counts of fraud under Alabama state law for misrepresentation, suppression and bad faith refusal to pay, counts II, III, IV, respectively. The Court subsequently dismissed count IV of the amended complaint for failure to state a claim.

Defendant argued throughout this litigation that the 12 1/2% royalty calculation only applied to revenues generated from the actual burial or "land-filling" of waste at Emelle. Defendant also maintained that it met its maximization obligations under paragraph 6.11 of the purchase agreement by spending millions of dollars developing Emelle into one of the nation's premiere hazardous waste disposal sites.

Prior to trial, Plaintiffs moved for partial summary judgment on the issue of interpreting the contract payment language.

2. Both sides referred to the quarterly installment payments as "royalty" payments. The Court will do the same. However, the Court recognizes the purchase and sale agreement designates the payments as part of the purchase price for the facility and other assets.

The Honorable Robert M. McRae[3] found no ambiguity in the purchase agreement with respect to the "all revenue" language. Paragraph 2.1 of the purchase agreement states in part:

(b) For the four calendar month period ending March 31, 1978 and for each three calendar month period thereafter for a term of 21 years from December 1, 1977, Buyer [Defendant] shall pay the Company [plaintiffs] or its designees the following amounts:

i) an amount equal to 12 1/2% of all revenues (exclusive of transportation revenues) from the operation of the Company's hazardous waste landfill site (the "Landfill Site") (the legal description of which is set forth in Schedule G, attached hereto and made part hereof) during each respective three calendar month period, as currently permitted and including any successor or replacement permits for currently permitted property or subsequently acquired property operated under said permits, or any additional permits required.

(c) For the twelve (12) calendar month period ending November 30, 1999 and for each twelve (12) calendar month period thereafter for a term equal to the useful operating life of the Landfill Site as currently permitted and including any successor or replacement permits for currently permitted property or subsequently acquired property operated under said permits, Buyer shall pay the Company or its designees an amount equal to 1% of all revenues (exclusive of transportation revenues) from the operation of the Landfill Site during each respective 12 calendar month period.

(Tr. Ex. 1, pgs.5–6).

Judge McRae held the contract payment terms covered "all revenues from all operations of the Emelle facility under any permits issued to the facility," and granted Plaintiffs' motion for partial summary judgement on this issue. (Order, entered December 29, 1994, pg. 6). The case was subsequently transferred to this division of the Court after Judge McRae's retirement. Defendant thereafter moved for reconsideration of that ruling by Judge McRae.

After a careful and independent review of the purchase agreement payment language, set out above, this Court concluded upon the entire record that no ambiguity existed in the contract royalty payment language. This Court adopted and reaffirmed Judge McRae's ruling and denied Defendant's motion for reconsideration. Moreover, the evidence submitted at trial demonstrated that Defendant's "new" interpretation of the contract payment language is clearly without any support in the record and is merely a mental fabrication in an attempt to justify Defendant's contractually unauthorized deductions from royalty payment calculations due Plaintiffs. Plaintiffs demonstrated by clear and convincing evidence that Defendant's corporate officers willfully and knowingly defrauded them of royalty payments. Not only did Defendant keep a secret set of revenue summaries detailing the unauthorized deductions and exclusions from the royalty payment calculations but Defendant also retained $450,000 in royalty payments due Plaintiffs despite the fact that Defendant's own accounting firm pointed out the error.

This Court concludes the Emelle contract was entered into by all of the parties thereto guided by highly competent legal advice. All parties had their eyes wide open. All parties fully agreed and understood the revenue royalty payment terms of the contract. There was an offer. There was an acceptance. There was consideration. The fact that the revenue royalty payments due by the contract terms exceeded the highest expectations of the

---

**3.** Honorable Robert M. McRae, Senior Judge, United States District Court for the Western District of Tennessee, retired.

parties gives the Defendant no right to brainstorm a "new" contract interpretation with the intention obviously to curtail the amount of revenue or royalty payments due plaintiffs. The purchase agreement payment language is clear. The language is totally unambiguous. A promise is a promise. As between the parties to this lawsuit, an unambiguous contract promise to pay a specified percentage of all revenues must be complied with. There is no alternative.

Accordingly, after a careful review of all of the evidence, including exhibits, testimony of witnesses, pleadings and submissions of counsel, and applicable law, the Court is of the opinion that judgment should be granted to the Plaintiffs on the breach of contract claims, Count I; the willful misrepresentation claim, Count II; and the fraudulent suppression of material facts claim, Count III. The Court is further of the opinion that judgement should be entered against the Defendant on its counterclaim based on alleged overpayment of contract royalties to plaintiffs.

The Court concludes Defendant should be directed to comply in good faith with all of the requirements of the contract and operate the Emelle hazardous waste site to its maximum capacity throughout the facility's economically useful life. Additionally, Defendant should be ordered to pay the costs of an annual financial audit of the Emelle facility's revenues and pay the costs of a review and evaluation of the facility's operations by an expert in the field of hazardous waste treatment and disposal operations. The annual financial audit and the expert's evaluation should be delivered to Plaintiffs or their representative no later than the last Monday of each July. Plaintiffs may, if necessary, petition the Court for appropriate review to ensure compliance with the provisions of this order.

The Court further finds that Plaintiffs are entitled to recover reasonable attorneys' fees and costs associated with pursuing this lawsuit as provided for in the purchase agreement entered into by the parties. The award of attorneys' fees and costs will be made by the Court after Plaintiffs submit a summary of attorneys' fees and cost incurred in this case and Defendant has had an opportunity to respond. The Court will also award appropriate punitive damages.

## FINDINGS OF FACT

In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## I. Background.

Plaintiffs in this case are: (1) James Massey, (2) David Wilder (3) James Parsons, (4) Mark Gregory, (5) Wesley Grace, (6) John Smith, (7) William Hagerman, (8) James Dugan, (9) William Oeding and (10) Charles Cooley. (Am.Compl.pgs.1–2).[4] Plaintiffs are all residents of the State of Tennessee except for James Parsons who is a resident of the State of Alabama and William R. Oeding who now resides in the State of Florida. (Am.Compl.pgs.1–2). The Defendant, Chemical Waste Management, Inc., (Chem Waste) is a Delaware corporation with its principal place of business in Oak Brook, Illinois. (Ans.Amend.Compl.pg.3).[5]

In 1977, Plaintiffs formed an Alabama corporation known as Resource Industries of Alabama, Inc. (RIA). RIA was formed to develop a commercial capacity hazardous waste disposal facility in Sumter County, Alabama. Plaintiffs chose Sumter County because a 1974 Environmental Protection Agency (EPA) Report listed the area as one of twelve potential sites throughout the United States suitable for a large scale hazardous waste treatment

---

4. Amended Complaint, page(s); hereinafter, "Amend.Compl. pg(s). ___."

5. Answer Amended Complaint page(s); hereinafter, "Ans.Amend.Compl. pg(s). ___."

and disposal facility.[6] (Ex. 54, Tab A, pg. 4).[7] Massey and Wilder each owned twenty-four percent (24%) of RIA's outstanding shares and Parsons owned twenty-eight percent (28%) of RIA. The remaining twenty-four percent was owned by an engineering partnership known as "HATS." The HATS partnership consisted of Mark Gregory, Wesley Grace, John Smith, William Hagerman, James Dugan, William Oeding and Charles Cooley. Mark Gregory, Wesley Grace and John Smith each owned 4.8% interest in RIA (20% of HAT's 24% interest in RIA). William Hagerman and James Dugan each owned 2.4% interest in RIA, William Oeding owned 3.6% and Charles Cooley owned 1.2%. RIA purchased approximately 340 acres of land near the town of Emelle, Alabama, and applied for an interim permit from the State of Alabama to operate the site. Parsons, the son-in-law of former Governor George Wallace of the State of Alabama, was apparently instrumental in obtaining an interim permit from Alabama's Department of Public Health. Plaintiffs obtained the necessary permit and began operations at the site soon thereafter.

Approximately four months later, Plaintiffs were approached by Don Price and Ray Brock of Waste Management, Inc. (WMI). Price and Brock were involved with operations and acquisitions for WMI. Price and Brock indicated that WMI was interested in either a joint venture or marketing agreement with RIA, acquiring RIA or competing against it. A short time later, Wayne Huizenga, President of Waste Management, Inc.; Don Flynn, Waste Management's Senior Vice President in charge of finance; and Bill Debes, administrative assistant to Mr. Huizenga involved with acquisitions, made an initial offer to purchase the facility from Plaintiffs sometime in the fall of 1977. (Tr. pgs. 186–188; 561–62).[8] After extensive negotiations, Plaintiffs entered into a written purchase agreement on February 3, 1978, with Alabama Solid Waste Systems, Inc (ASWSI) for the sale of the facility and other assets. (Ex. 1, the "Agreement," signed February 23, 1978).

In 1978, Alabama Solid Waste Systems, Inc., was a wholly-owned subsidiary of Waste Management Inc. ASWSI became Waste Management of Alabama, Inc. ("WMAI") at some point after the agreement was signed. (Ex. 2). WMAI was then merged into Waste Management, Inc. (WMI). Waste Management, Inc., now called "WMX Technologies, Inc." (WMX), unconditionally guaranteed ASWSI's performance of its obligations under the contract and wholly owned Chem Waste. (Ex. 1, pg. 64, Tr. 1873, Ex. 133, pg. 6; *see also,* Defendant's Post–Trial Revised Findings of Fact and Conclusions of Law, pgs. 7–8; Tr. Vol. IV, pgs. 386–88).

## II. Plaintiff's Breach of Contract Claim, Count I.

Plaintiffs claim Defendant breached two important provisions of the purchase agreement, paragraph 2.1, the quarterly payment provision, and paragraph 6.11, the maximization provision of the purchase agreement.

### A. Payment Under Paragraph 2.1(b)(i) of the Purchase Agreement.

Paragraph 2.1 of the purchase agreement states in part as follows:

(b) For the four calendar month period ending March 31, 1978 and for each three calendar month period thereafter for a term of 21 years from December 1,

---

**6.** Sumter County was also listed, at least in part, due to its unique geology. The soil there apparently consists of large deposits of Demopolis chalk or as it is sometimes called "Selma chalk." This chalk is highly impermeable and estimated to be at least 700 feet deep below the top soil in places. This characteristic makes Sumter County an ideal location for burial of hazardous waste.

**7.** Trial Exhibit, hereinafter "Ex."

**8.** Transcript page(s); hereinafter, "Tr. pg(s). ___."

1977, Buyer [Defendant] shall pay the Company [Plaintiffs] or its designees the following amounts:

i) an amount equal to 12 1/2% of all revenues (exclusive of transportation revenues) from the operation of the Company's hazardous waste landfill site (the "Landfill Site") (the legal description of which is set forth in Schedule G, attached hereto and made part hereof) during each respective three calendar month period, as currently permitted and including any successor or replacement permits for currently permitted property or subsequently acquired property operated under said permits, or any additional permits required.

(c) For the twelve (12) calendar month period ending November 30, 1999 and for each twelve (12) calendar month period thereafter for a term equal to the useful operating life of the Landfill Site as currently permitted and including any successor or replacement permits for currently permitted property or subsequently acquired property operated under said permits, Buyer shall pay the Company or its designees an amount equal to 1% of all revenues (exclusive of transportation revenues) from the operation of the Landfill Site during each respective 12 calendar month period.

(Ex. 1, pgs.5–6).[9]

As indicated earlier, Judge McRae interpreted this provision to cover "all revenues from all operations of the Emelle facility under any permits issued to the facility." This Court finds that the words "landfill site" used in paragraph 2.1(b)(i), followed by the legal description of the property, indicates that the parties intended payments to be calculated at 12 ½ % on all revenues incident to the operations of the

facility as the facility exists within the boundaries of the area of land described in Scheduled G. The Court finds no ambiguity in the contract payment language and reaffirms and adopts the Court's earlier rulings on this issue.

■ To verify the accuracy of royalty calculations and payment throughout the term of the agreement, each side appointed a representative to calculate the facility's revenues and the quarterly installments or royalty payments. At the end of each quarter, each representative would compare his figures with the other's, and if the figures matched, Chem Waste would be directed to issue payment to Plaintiffs. Along with the quarter installment payment, Defendant would prepare and send Plaintiffs a "quarterly statement" setting forth the revenues and royalty calculation for that quarter. (Ex. 4 & 5). From about 1978 to 1980, Mr. Parsons was Plaintiffs' representative. (Ex. 7). Jim Phillips, controller for the Emelle facility for a period of several years, was Chem Waste's representative.[10]

Parsons testified that he and Phillips would take all the revenue from all of the accounts receivable for each quarter, deduct any transportation costs, and designated or called that net figure "disposal revenue." He and Phillips would then multiply the "disposal" revenue figure by twelve and a half percent to compute the basic installment or royalty payment. (Tr. pg.140). Parsons also testified that during the time he calculated the royalty, Chem Waste was primarily involved with transportation and land disposal of waste. However, Parsons went on to state that the site did have two lagoons involved with neutralization and treatment of waste. Parsons testified that the reve-

---

9. The agreement did provide for including transportation revenues in the calculation under certain circumstances not in dispute here.

10. Plaintiffs Mark Gregory and James Parsons were employed by Chem Waste in accordance with the purchase agreement. Gregory

was general manager from 1978 to 1981. He then became regional manager. Jim Parson worked for Chem Waste for about a year and a half in public relations and marketing. He left Chem Waste's employment sometime around 1980.

nues generated from these lagoons, or treatment processes, were included in the "disposal revenue" definition used to calculate the royalty payment.

Parsons also testified that on one or maybe two occasions, the quarterly installment computation excluded some "off-site" revenue. Parsons indicated this was done because Emelle had no involvement with the waste other than billing. Mark Gregory confirmed Parson's testimony on this point. Gregory testified that some revenue was not included in the royalty calculation because it was not related to Emelle's operations but merely taken off a truck at Emelle and then loaded on another truck for shipment to another facility. Gregory, Parsons and all the other Plaintiffs indicated they knew about and agreed to this exclusion of revenue from the royalty calculation. This exclusion of revenue was shown on the quarterly revenue summaries as "non-qualifying" revenue for the relevant time period. (Tr. pgs. 104–42, Ex. 4, Tab 1979).

In 1981, Jim Parsons left Chem Waste. Plaintiffs then engaged Drayton Pruitt, an attorney, to act as escrow agent for the royalty payments.[11] In 1981, a representative for Chem Waste approached Plaintiffs and requested that Plaintiffs agree to exclude from the royalty calculation revenues generated from incinerating waste at sea on a ship named the Vulcanus.[12] (Ex. 6; Tr. pgs. 133–34, 406–10). Plaintiffs testified that they agreed to this exclusion on the assumption it would increase their royalty payments because the Vulcanus ship could feed the Emelle facility with residual waste left over from the incineration pro-

cess. In addition, Emelle apparently did not have the capability to incinerate this type of waste at that time. According to Plaintiffs, no other exclusions or deductions were authorized from the royalty calculation.[13]

Beginning in 1981, questions began to surface within the Chem Waste organization about different types of waste "streams" associated with Emelle's operations. Specifically, questions arose as to the proper accounting procedures for these new waste streams for purposes of Plaintiffs' royalty calculation. (Ex. 11, 12, and 13). Jim Phillips, Emelle's controller, sent several memos to Chem Waste's upper management about his questions and how to account for these new revenues. (Ex. 11, 12, and 13). Frank Krohn, who was involved in the drafting of the purchase agreement and who was at that time general counsel and vice president for Chem Waste, responded to Jim Koenig's[14] October 2, 1981, memo stating that, " 'if cleanups' *are incident to 'operation of hazardous waste landfill site' they should be included* in the 12 1/2% of revenues; if not, they should be excluded. Perhaps Don should make a proposal to Mark [Gregory]." (Ex. 12) (emphasis added).

In May of 1983, Bruce Tobecksen became vice president and chief financial officer for Chem Waste. He was responsible for all financial reporting and accounting for Chemical Waste Management and for payment under the contract.[15] Tobecksen began receiving memos questioning whether certain "revenue streams" should be included in the royalty calculations as early as June of 1983. (Ex. 16, 17, 18 and 19).

11. Mr. Pruitt also represented Plaintiffs during the negotiations and sale of the facility to Defendant in 1977.

12. Both sides referred to this revenue as the "Vulcanus" revenue.

13. The parties do not dispute that the sale of capital assets or miscellaneous revenue generated at the site (i.e. cafeteria and vending machine revenues) were not to be included in the royalty calculation.

14. Jim Koenig was vice president and controller for Chem Waste at this time.

15. Mr. Tobecksen stated in his deposition read at trial that he was employed by Waste Management in Argentina at the time the contract was entered into with Plaintiffs and had nothing to do with its negotiations.

On June 14, 1985, William Ingram, who at that time was Regional Controller for Chem Waste, sent Tobecksen a memo about the royalty situation and stated that Chem Waste's "objective is to limit the amount of monies spent on royalty payments to increase pre-tax earnings and increase cash flow." Ingram also listed what he believed to be Chem Waste's only two realistic options: (1) buying out Plaintiffs; or (2) negotiating a maximum annual payment. Ingram further stated that he "disagree[s] with Don Flynn's approach of breaking down each of the processes and only paying on the disposal element" for three reasons; one being, "there is no basis in the agreement for such an interpretation." (Ex. 18). In October of 1985, John Calhoun was controller for the Emelle site. Calhoun sent a memo to Tobecksen dated October 29, 1985, wherein Calhoun outlines the discussion he had with Tobecksen concerning the decision that was made to exclude certain revenues from the royalty calculation. (Ex. 19). In a hand-written response to that memo dated November 12, 1985, Tobecksen replies, "I agree with the accounting interpretation." (Ex. 19).

Based on the evidence in this case, the Court finds that Chem Waste knowingly breached the payment provision of the purchase agreement, paragraph 2.1(b)(i). Chem Waste intentionally made unauthorized and undisclosed deductions and exclusions of revenues from the quarterly installment or royalty calculations.

### B. The Failure to Maximize pursuant to Paragraph 6.11 of the Agreement.

■ Plaintiffs claim Chem Waste breached the maximization provision of the agreement, paragraph 6.11, by not having processes in place to handle waste banned from land-filling beginning in 1987. Paragraph 6.11 states that "[b]uyer [Defendant] agrees to operate a hazardous waste disposal facility as herein defined and as improved by the capital investment herein required to its maximum capacity during the full economically feasible life of such facility." (Ex. 1, pg.27). In accordance with paragraph 6.8 of the Agreement, Defendant was required to expend no less than 1.5 million dollars within the first eighteen months to improve the facility from the date of purchase in accordance with the proposed budget stated in Schedule "U". Schedule "U" provided for the expenditure of approximately $400,000 to $500,000 to purchase additional land and between $300,000 and $400,000 for the purchase of additional processing equipment and other improvements. (Ex. 1, pgs. 26 & Tab 24).

Plaintiffs called William Hagerman, one of the plaintiffs in this lawsuit, to testify as their expert in the field of hazardous waste management. His testimony related, in part, to the failure to maximize claim. As indicated earlier, Mr. Hagerman was a member of the HATS partnership that owned an interest in the Emelle facility. Mr. Hagerman has a degree in civil engineering and has specialized in environmental engineering both educationally and professionally. In addition, Mr. Hagerman is a licensed engineer in twelve states and does extensive consulting work with numerous firms in the hazardous waste industry. In fact, Mr. Hagerman was still employed by Chem Waste as a consultant at the time of trial. Moreover, Hagerman consulted extensively with Chem Waste on various projects at Emelle including its incineration capability and the permitting of the facility.

Plaintiffs testified that from the beginning they anticipated the development of the Emelle site into a full service facility with incineration capabilities. In fact, at the time of the purchase, Plaintiffs had already made a down payment on an incinerator which was constructed and briefly placed in operation on the site. (Tr. 418–21, 675, Ex. 54, Tab C). This incinerator was known as the ULD incinerator. (Tr. 674–77, Ex. 54, Tab C, as it existed in 1982). Hagerman pointed out that this incinerator was omitted from Emelle's

"Part B" RCRA (Resource Conservation and Recovery Act) permit application for the site that was sent to the EPA for approval. (Tr. 421, 685–88, 691–93).

After closing the ULD incinerator, Chem Waste proposed a chalk drying-"PCB" incinerator. A "PCB" designated incinerator is "permitted" or licensed under the "Toxic Substance Control Act" regulations (TSCA). (Tr. 421, 712–715, Ex 37; Ex. 54, Tab E). Chem Waste did a special project analysis study for the proposed PCB incinerator in March of 1984. (Ex. 54, Tab E). A notation to this study states that "many people estimate that the maximum amount of available PCB material for incineration to be twenty to thirty million dollars per year." (Ex. 37, pg 1; Ex. 54, Tab E, pg. 1). Hagerman testified that he thought this was a reasonable estimate of the market at that time. Exhibit 37, page 11 and Exhibit 54, Tab E, (Bates stamped no. E004506), indicate that the total estimated revenue for this incinerator for the first five years of its operation to be two-hundred fourteen million nine hundred and forty-seven thousand dollars ($214,947,000). Plaintiffs' royalty payment on this revenue would have been approximately twenty-six million eight hundred and sixty-eight thousand three hundred and seventy-five dollars ($26,868,375). The analysis also anticipates the total capital requirements to be eight million three hundred and thirty-seven thousand dollars ($8,337,000) and the payback period to be less than one year. (Ex. 54, Tab E, Bates Stamp pg. no. 004505; Tr. 720–26). Hagerman testified that this incinerator was not built and he did not know why Chem Waste did not build it. (Tr. 726).

In 1985, Chem Waste developed a market study of a rotary kiln incinerator at Emelle. (Ex. 54, Tab G). This study suggested that Emelle could lose thirty to fifty percent of its site revenues through the implementation of the Hazardous and Solid Waste Amendments (HSWA) of 1984 to RCRA unless alternative processing was developed. (Tr. 731–32; Ex. 54, Tab G, pg. 2). Mr. Hagerman indicated that some of HSWA's provisions were commonly referred to as "hammers" in the industry. (Tr. 737). These "hammers" required certain waste to be handled or processed in a particular manner after a certain date. For example, in August 1988, a ban was placed on high volume/high toxicity waste from land-filling. (Ex. 54, Tab G, pgs. 6–7; Tr. 735–40). Hagerman indicated that it was well known these hammers would require different types of treatment processes for particular waste streams and Chem Waste should have taken steps to ensure it did not lose its capability to handle these waste streams and the revenue they produced.

In January of 1986, Bruce Tobecksen and Jerry Dempsey sent a memo to WMI's management committee requesting expenditure of engineering funds to develop incineration capability at Emelle costing approximately twelve million dollars. (Ex. 54, Tab J; Tr. 753). At that time, Tobecksen was Chem Waste's Chief financial officer and Dempsey was Chem Waste's President. (Tr. 753). Notably, the financial assumptions of this project did not include royalties for Plaintiffs on the revenues generated by this incinerator. (Ex. 54, Tab J, pg. 2). Sometime later, in 1988, Jack Adams, the project manager for this incinerator, wrote a critical report indicating it was unlikely that Emelle would obtain a workable permit in the near future due to permitting problems. (Ex. 54, Tab H). However, in 1987, Chem Waste submitted a Part B permit for an incinerator at their Port Arthur, Texas, facility designed to handle 150 million BTU's (British Thermal Units) of waste per hour. (Tr. 769–70; Ex. 54, Tab N). Compared to the Port Arthur incinerator, the Emelle incinerator was three times smaller. (Tr. 770–71). The Port Arthur incinerator began accepting waste in the early part of 1990, and Chem Waste increased the thermal capacity for the Port Arthur incinerator up to one hundred and seventy-five

million BTU's per hour. (Tr. 771). Hagerman was of the opinion that Chem Waste's decision to build the Port Arthur incinerator with three times the capacity as needed, "pretty well without a doubt makes a conclusion that there will never be an incinerator at Emelle ..." (Tr. 777).

Hagerman also testified that based on information submitted to the Texas National Recourse Conservation Commission by Chem Waste, he was able to determine that Chem Waste was shipping a considerable amount of waste to Port Arthur from Emelle. (Tr. 775, Ex. 54, Tab O). Hagerman also testified that the waste tonnage estimates from the Tobecksen–Dempsey memo turned out to be fairly accurate based on the amount of waste sent to Port Arthur from the State of Alabama. (Tr. 778–80). Accordingly, based on his analysis, Hagerman was of the opinion that Emelle lost two hundred and twenty-five million one hundred and twelve thousand six hundred and eighty-five dollars ($225,112,685) of incineration revenues from 1987 to 1998. (Ex. 54, Tab P; Tr. 780–81, 785–86). Hagerman calculated 12 1/2% of this amount to equal twenty-eight million one hundred and thirty-nine thousand and eighty-six dollars ($28,139,086). (Ex. 54, Tab P, Tr. 785–86). Hagerman used the time period beginning in 1987 for lost revenues from incineration because he was of the opinion that Chem Waste could have operated the incinerator included in the draft permit issued by the EPA as modified and approved by the Administrative Law Judge in the permit appeal proceedings. (Tr. 780–85). Hagerman indicated he ended his calculation in 1998 based on his opinion that Chem Waste could not get an incinerator permitted and operational at Emelle until 1998 if they started at the time of trial. (Tr. 781).

Hagerman also testified that a supplemental fuels blending program known as "Unit 700" had been in operation at Emelle since around 1980. However, Hagerman stated that a company known as OHM Materials, which was acquired by Chem Waste, actually managed the program from OHM's Morrow, Georgia, facility. Hagerman indicated that for the last couple of years the revenues from the fuels program accrued to the Morrow, Georgia, facility and not Emelle. Hagerman indicated he and the other Plaintiffs did not receive any royalty on this revenue. (Tr. 788–91, Ex. 56).

Based on his analysis, Hagerman testified that Chem Waste had spent slightly over eighty million dollars on developing Emelle, primarily as a landfill operation, compared to over two hundred million dollars spent solely on incineration capability at Port Arthur. (Tr. 791–805). Hagerman also testified that Chem Waste had only developed approximately 350 out of 2700 acres of available land at Emelle covered by the permit issued to Chem Waste. Hagerman indicated this represents about one quarter of the nation's permitted capacity for hazardous waste disposal. He was also of the opinion that the full economic life of the facility is approximately one hundred years. (Tr. 805–06). Finally, Hagerman gave his opinion that Chem Waste had not operated Emelle to its maximum capacity as required under the agreement. (Tr. 805).

Chem Waste offered various reasons why it abandoned the incineration project planned for Emelle and why various waste treatment processes were either sold or shifted to other corporate entities and facilities. In particular, Chem Waste argued that the political climate in the State of Alabama at that time concerning the importation of hazardous waste to the State prevented it from obtaining a workable permit for the facility and the incinerators it attempted to license. Undoubtedly, Chem Waste faced difficulty in obtaining permits for the incinerators at Emelle. However, the Court concludes that Chem Waste could have operated the incinerator at Emelle included in the draft permit issued by the EPA as modified and approved by the Administrative Law Judge in the permit appeal proceedings. The

Court is also of the opinion that Chem Waste abandoned its efforts to obtain licensing for an incinerator at Emelle because Chem Waste realized it could send its incinerator waste to its Port Arthur, Texas facility and not pay Plaintiffs a royalty on the revenue generated. In other words, Chem Waste did not use its best efforts or attempt in good faith to secure incineration capability at Emelle. The Court also finds discussion of Defendant's reasons for not being able to secure incineration capability at Emelle and for transferring revenue generating processes to other locations or corporate entities to be of little assistance. Simply stated, Defendant's witnesses and the reasons for abandoning the incineration project at Emelle as well as shifting waste and revenue generating processes to other facilities were not credible.[16]

· Based on the record in this case, the Court finds that Chem Waste breached paragraph 6.11 of the purchase agreement by not developing and operating the Emelle facility to its maximum capacity. Chem Waste failed to obtain incineration capability for Emelle. Chem Waste also breached the maximization provision of the purchase agreement by diverting waste to other corporate related entities and/or facilities. Furthermore, the Court finds Chem Waste breached the maximization provision by willfully and knowingly divesting the Emelle facility of revenue generating waste treatment and handling processes.

## III. Fraudulent Misrepresentation and Suppression.

▉ The Court now turns to Plaintiffs' fraud claims. Plaintiffs allege in count two of the amended complaint that Chem Waste violated Alabama Code Sections 6–5–101, 103 and 104 by fraudulently misrepresenting the facility's revenue figures. The elements of fraudulent misrepresentation under Alabama law are: (1)

that the defendant made a false representation to the plaintiff; (2) that the false representation related to a material fact; (3) that the plaintiff justifiably relied on the false statement; and (4) that the plaintiff sustained damages as a proximate result. *Braswell v. ConAgra, Inc.,* 936 F.2d 1169, 1174 (11th Cir.1991) (citations omitted). In count three, Plaintiffs allege Chem Waste violated Alabama Code Sections 6–5–102 and 104 by fraudulently suppressing the exclusions and deductions from the facility's revenues. The elements for suppression of a material fact are "(1) that the defendant had a duty to disclose a material fact; (2) that the defendant either failed to disclose or concealed that material fact; (3) that the defendant's failure to disclose or his concealment of that material fact induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered damage as a result of his action, or inaction, induced by the defendant's failure to disclose or his concealment of the material fact." *The Independent Life & Accident Insurance Co. v. Harrington,* 658 So.2d 892, 896 (Ala.1994) *citing, Soniat v. Johnson–Rast & Hays,* 626 So.2d 1256, 1258–59 (Ala.1993); *see also, Wolff v. Allstate Life Insurance Co.,* 985 F.2d 1524, 1529 (11th Cir.1993).

▉ Plaintiffs have established the elements for fraudulent misrepresentation, Count II, by clear and convincing evidence. Chem Waste sent Plaintiffs quarterly statements that falsely represented that the royalty payments were calculated on 12 1/2% of "disposal" revenues which term both parties understood and intended to include all revenues exclusive of transportation revenues according to the terms of the purchase agreement. Chem Waste sent Plaintiffs royalty checks that falsely represented the quarterly installment payments equaled 12 1/2% of all revenues from the operation of the hazardous waste landfill site as provided by the agreement. The Court finds the rep-

---

**16.** Although Dr. Henson appeared to be a competent witness, the Court was not, and is not, persuaded his testimony on the maximization claim is entirely credible.

resentations made by Defendant on the quarterly revenue summaries and the royalty checks related to a material fact. The Court finds Plaintiffs justifiably relied on the false statements in the revenue summaries and royalty checks. Lastly, the Court finds Plaintiffs sustained damages as a proximate result of Defendant's fraud.

■ The Court also finds Plaintiffs have established the elements for fraudulent suppression of material facts, Count III, by clear and convincing evidence. Over the years, Plaintiffs questioned whether they should audit Chem Waste as allowed under the terms of the purchases agreement. However, on each occasion, Mark Gregory, who had developed a relationship with many of Chem Waste's management officials, felt there was no reason to believe that Chem Waste was not paying them properly pursuant to the contact based on the reassurances made by Chem Waste's officers. In 1990 or 1991, Gregory contacted Bill Ingram, who was regional controller for Chem Waste at that time, and asked Ingram if Chem Waste was computing the royalty payments in the usual manner. Gregory stated that Ingram told him they were doing everything the same. (Tr. 422–23): In 1992, when Chem Waste was changing Emelle to a "costs center," Gregory called Mr. Ingram and asked him again about the calculation of the royalty. Gregory states that at that time, Ingram told him they (Plaintiffs) were going to be paid on all revenue. (Tr. 423–24).

The Court also finds that Chem Waste had a contractual obligation to disclose any material facts and not mislead Plaintiffs in accordance with paragraph 6.15 of the purchase agreement. Paragraph 6.15 states in relevant part that

> Buyer [Defendant] warrants that all the representations, statements, certificates, agreements, exhibits and schedules provided by it are true and correct in all material aspects. It warrants ... that this Agreement, Schedules hereto, and all other documents and information

> previously submitted herewith *or hereafter furnished to Company and Shareholders [Plaintiffs] and its representatives pursuant thereto. do not and will not include any untrue statement of material fact or fail to include any material fact, all to the end that such statements are not misleading.*

(Ex. 1, pgs.28–29) (emphasis added).

Chem Waste undertook this contractual obligation when it entered into the contract. (*See,* Defendant's Answer to the Amended Complaint, pgs. 9). Evidence in the record clearly shows that Chem Waste violated its promise and this provision of the Agreement.

Chem Waste had a duty to disclose its purported "re-interpretation" of the contract payment language. The Court finds that this duty arises from the "particular circumstances" created by paragraph 6.15 of the agreement as well as Plaintiffs' and Defendant's relative access to the information concerning Emelle's finances and the royalty payment calculations. *See, Wolff v. Allstate Life Insurance Co.,* 985 F.2d 1524, 1528–31 (11th Cir.1993). Chem Waste also had a duty to disclose its deductions and exclusions of revenues from the royalty payment calculations. Chem Waste also had a duty to disclose the fact that it began calculating the royalty payments in a manner substantially different from previous occasions and the manner in which it made the calculations resulted in a substantial loss to Plaintiffs. Chem Waste intentionally failed to disclose and concealed the above material facts from Plaintiffs. Chem Waste's failure to disclose and its decision to conceal the above material facts induced Plaintiffs not to act. Lastly, Plaintiffs suffered damage as a result of Chem Waste's fraudulent action.

Simply stated, the Court finds by clear and convincing evidence that Chem Waste fraudulently misrepresented Emelle's revenues and fraudulently suppressed the unauthorized deductions and exclusions of

revenue from the quarterly installment payment calculations.

## IV. Plaintiffs' Contract Damages.

### A. Excluded Revenues

Having concluded the Defendant materially breached the purchase agreement, the Court will now address the issue of damages.

Plaintiffs called Phillip Shannon as their expert witness to testify on the issue of damages in this case. Mr. Shannon, a Certified Public Accountant (CPA), has been an accountant for twenty-three years and is one of four partner with the accounting firm of KPMG Peat Marwick in Memphis, Tennessee. He specializes in auditing and is responsible for the audits of a number of large billion dollar manufacturing companies.

Mr. Shannon identified the following categories of revenues or "revenue steams" that were excluded from the royalty calculations: (1) truck wash fees, (2) lab fees, (3) Wilsonville and Denver project revenues, (4) incinerator ash revenue, (5) reductions in revenues, (6) unreported revenues, (7) waste processed at Emelle but not recorded, (8) PCB waste, (9) Alabama Hazardous Waste disposal taxes, (10) revenues transferred to non-facility records and (11) intra/intercompany pricing differences. The Court will address each of these categories separately.

■ **(1) Truck Wash Fees.** Mr. Shannon first identified three hundred ninety-two thousand and forty-three dollars ($392,043) in truck wash fees that were excluded from the royalty calculation from 1985 to May 31, 1995.[17] (Ex. 77, Schedule B). Defendant agrees that under the Court's partial summary judgment ruling, these fees are revenues from the activities of Emelle and should have been included in the royalty calculations. (Def.'s Revd. Find. Fact. pgs. 23, 25–26).

**(2) Lab Fees.** Mr. Shannon identified four million five hundred thirty-seven thousand two hundred and eighty-nine dollars ($4,537,289) in lab fees that were excluded from the royalty calculation from 1985 to May 31, 1995. (Ex. 77, Schedule B). Defendant agrees that under the Court's partial summary judgment ruling, these fees are revenues from activities of Emelle and should have been included in the royalty calculations. (Def.'s Revd. Find. Fact. pgs. 23, 25–26). Notably, Chem Waste closed the lab at the Emelle facility and began sending their lab work to another location.

■ **(3) Wilsonville and Denver project revenues.** Mr. Shannon identified four million three hundred seven thousand five hundred and three dollars ($4,307,503) in revenues generated from the Wilsonville and Denver hazardous waste clean up projects. (Ex. 77, Schedule B). These revenues occurred between 1985 and 1988. Defendant claims all but the 1988 revenues of $2,633 are time barred. In addition, Chem Waste argues that Plaintiffs have failed to demonstrate what part of the revenues are attributable to off-site operations and therefore not attributable to disposal at Emelle.

Dr. Henson testified that he, Mark Gregory, and others developed remediation services for customers to capture hazardous waste in the market. This basically consisted of cleanup services for hazardous waste at a particular site or location. As part of the remediation process, the hazardous waste would be brought back to Emelle for disposal. (Tr. pgs.1704–05). This program or service later came to be called "ENRAC." ENRAC was a profitable service and was later traded to another corporation, Rust Engineering, in exchange for part of that company's stock. (Tr. pgs.1706–07). It appears that the ENRAC service or

---

17. Although Plaintiffs' cannot recover any damages prior to 1987 on its breach of contract claim pursuant to Alabama's statute of limitations, they can recover those damages as part of their fraud claims as discussed later by the Court.

remediation program was initially part of Emelle's operation and its revenues were treated as Emelle's revenues for purposes of the royalty calculation. (Tr. pg.463).

Mr. Shannon testified that the revenues from Wilsonville and Denver were recorded as "contra expenses" to Chem Waste instead of revenue. (Tr. pgs.1028–29, 1033–37). According to Mr. Shannon, in accounting terms, revenues are credits and expenses are debits. A "contra-expense" is where a revenue is recorded as a reduction in expense rather than as revenue. (Tr. pgs.1028–29). This type of recording has the effect of reducing expenses so the bottom line remains unchanged but revenues are reduced. (Tr. pg.1034). Mr. Shannon also testified that Defendant's recording of these projects as contra-expenses had the effect of reducing revenues upon which the contract payment was to be calculated. (Tr. pg.1035).

Based on the record in this case, the Court finds the Wilsonville and Denver project revenues were part of the operation of the Emelle facility and subject to the 12 1/2% royalty calculation. The Court concludes Plaintiffs are not limited to recovery of these revenues occurring in 1988.

(4) **Incinerator Ash Revenue.** Plaintiffs' expert identified one million nine hundred ninety-five thousand five hundred and fifty-eight dollars ($1,995,558) in revenues from incineration ash buried at Emelle that was incorrectly excluded from the royalty calculation in 1992. (Ex. 77, Schedule C). Chem Waste initially recorded this item as revenue but later made a journal entry to change it to a "contra-expense." (Tr. pgs.1037–38). Chem Waste does not dispute that it should have paid Plaintiffs 12 1/2% in royalty on this revenue. (Def.'s Revd. Find. Fact. pg. 26). Accordingly, the Court finds Plaintiffs are entitled to a 12 1/2% royalty payment on this item of revenue.

(5) **The 1992 Recalculation–Reduction of Revenue.** Mr. Shannon identified eight million three hundred thirty-two thousand eight hundred and forty-seven dollars ($8,332,847) in revenue for the year 1992 that Chem Waste excluded from the "total disposal revenue" figure included in the quarterly statement sent to Plaintiffs. (Ex. 77, Schedule C; Ex. 5, Tab 1992 last page). This figure was calculated as a reduction from the royalty payment for December of 1992. (Ex. 5, Tab 1992, last page). Defendant argues Plaintiffs have not met their burden of demonstrating that these revenues are related to the operations of Emelle, and that these items are nothing more than off-setting adjustments or corrections of certain accounting entries.

Defendant's own "disposal revenue" recalculation indicates the above sum is part of Emelle's revenue. (Ex. 5, Tab 1992, last page). In addition, Ann Akin, controller for Emelle during this time period, stated that the figure represents several different line items. Part of the eight million represents the December 1992 revenue for incinerator ash from Port Arthur and TWI buried at Emelle. (Tr. pg.331). The remaining part consist of the items outlined in the January 28, 1993, letter to Drayton Pruitt from Chem Waste where it claimed it mistakenly overpaid Plaintiffs. (Ex. 31). The Court finds that Plaintiffs have adequately demonstrated by a preponderance of the evidence that these revenues are a part of Emelle's revenues and Plaintiffs are entitled to a 12 1/2% royalty payment calculated on these revenues.

(6) **Unreported revenues.** Mr. Shannon next identified one million two hundred seventy thousand four hundred and ninety-two dollars ($1,270,492) as revenue recorded on Emelle's general ledger but not reported for purposes of Plaintiffs' royalty payment. Defendant opposed any award to Plaintiffs for this item for the same reasons listed above. The Court finds Plaintiffs have shown by preponderance of the evidence that these revenues were generated as part of the hazardous waste operations occurring at the Emelle

Facility and should be included in the royalty calculation.

■ (7) **Waste Processed at Emelle But Not Recorded.** Mr. Shannon identified six million three hundred and ninety-nine thousand four hundred and nineteen dollars ($6,399,419) in revenue from 1981 to May 31, 1995, from waste streams processed at Emelle but not recorded as revenue by Chem Waste. (Ex. 77, Schedule D–1). Mr. Shannon indicated Emelle recognized $45,105 for 1981 and $2,710 for 1985 for solvent waste streams in those years. (Ex. 77, Schedule D–1; Tr. 1050–51). These amounts were derived from the calculation work sheets prepared by Chem Waste. (Tr. 1055–51).

Mr. Shannon stated that he relied on the "revenue code summaries" (RCS) as the most reliable information regarding the revenues of the facility. For the years 1992, 1993, and 1994, the revenue code summaries showed invoices for amounts that were not subsequently reported on the general ledger or operating income report. (Tr. pg.1051). In 1992, the RCS's showed $78,996 invoiced for bulk liquid fuels and special bulk solids but not recorded as revenue to Emelle. For 1993, Mr. Shannon found the general ledger indicating $138,353 more in revenue than the revenue code summaries so he reduced the amount Plaintiffs claimed by $138,353 for 1993. (Ex. 77, Sch.D–1). For 1994 and 1995, Mr. Shannon determined Chem Waste had not included as revenue the 1994 $4,509,474 fuels program revenue and $1,901,487 for the first half of 1995 in fuels revenues.

Chem Waste argues these revenues were from a fuels activities program of a separate entity called RMI. Chem Waste also argues the agreement did not prevent Defendant or its parent company from selling or transferring assets or operations as business conditions dictated. (Def.'s Revd. Find. Fact. pgs. 27).

The Court finds all the above amounts identified by Mr. Shannon should have been included as revenues for the Emelle facility for purposes of Plaintiffs' royalty payments. Plaintiffs have shown by a preponderance of the evidence that the above revenue items were from the operation of the Emelle facility. The Court specifically rejects Defendant's assertion that by transferring an operation to another entity and then operating it on the site, Defendant is thereby relieved of its royalty obligation to Plaintiffs. If the Court accepted this argument, all Defendant would have to do is transfer each operation to a separate company, even one at the Emelle site, and ultimately owe Plaintiffs nothing. Defendant's argument is foreclosed by the payment provision of the contract as well as the maximization provision, paragraph 6.11, of the purchase agreement. Accordingly, the Court concludes Plaintiffs are entitled to 12 ½ % of the revenues identified by Shannon on Schedule D–1. (Ex. 77).

(8) **PCB Waste.** Mr. Shannon also identified twenty-one million two hundred ninety-two thousand nine hundred and sixty-four dollars ($21,292,964) in revenue from PCB waste that was backed out of Emelle's revenues for purposes of the royalty calculation. (Tr. pg. 1054; Ex. 77, Schedule D). This amount represents treating, processing and repackaging revenues for waste received and then shipped out to an off-site incinerator. The figures also represents revenues from PCB waste that were buried at Emelle in 1988 and 1989 but were excluded from the royalty calculation. The royalty payment on the amount of revenue excluded from burial at Emelle amounted to approximately $450,000. Chem Waste's own outside auditor, Arthur Anderson & Co., discovered this error and bought it to management's attention. Despite this fact, Chem Waste it did not inform Plaintiffs of the error or attempt to correct it by paying Plaintiffs. Moreover, Chem Waste had not corrected this error at the time of trial.

Chem Waste claims Plaintiffs can only recover 12 1/2% of $23,580 of the PCB

revenues because the remainder is either time-barred or attributable to off-site incineration. For the reasons discussed above, the Court rejects this narrow interpretation of the purchase agreement. The incineration revenues, even if the incineration occurred off-site, are clearly related to and part of the operation of the Emelle facility because the necessary treatment, processing and repackaging of waste for incineration took place at Emelle. Again, the Court does not find that Plaintiffs are limited in their recovery to 1987 revenues because the earlier revenues can be recovered as part of Plaintiffs' damages under their fraud claims.

■ (9) **Alabama Hazardous Waste Disposal Fees/Taxes.** Mr. Shannon also indicted that Chem Waste excluded one hundred and eleven million three hundred twenty-two thousand eight hundred and forty-seven dollars ($111,322,847) from the royalty calculation which represented the hazardous waste fees/taxes imposed on Chem Waste by the State of Alabama that Chem Waste passed on or collected from its customers. (Ex. 77, Schedule D). *See,* Alabama Code § 22–30B–1 *et seq.* as amended (1992). The parties dispute whether the taxes collected from Chem Waste's customers should be counted as revenue to the site as argued by Plaintiffs or analogous to sales or excise taxes as argued by Defendant and not recognized as revenue to the facility.

Mr. Shannon stated that under generally accepted accounting principles taxes are treated as expenses and thus any amounts collected from customers to recoup these fees are revenues. Defendant's expert, Eileen P. Scudder, a CPA and partner in the accounting firm of Deloitte & Touche, gave her opinion that the disposal taxes are not revenue from the operation of Emelle because Emelle is not in the business of generating revenues through taxes. She indicated that the taxes are analogous to sales or excise taxes for which Chem Waste does not derive any benefit but merely collects from customers for the

State of Alabama and should not be recognized as revenues for the purposes of the royalty calculation.

The statute clearly imposes the tax on the operator of a hazardous waste disposal facility and not the generators of the waste. Ala.Code § 22–30–B–2. (1992). (Ex. 67). It appears the Alabama Legislature did set the tax rate at a relatively high rate whereby Chem Waste would, of business necessity, have had to pass the tax on to the generators of the waste or possibly go out of business. (Tr. 2380–81). The tax is also calculated on an amount of waste the operator receives from the generator and certain generators could seek an exemption from the tax. Ala.Code § 22–30B–2(d). Moreover, the tax is based on a transaction with a customer and calculated according to the size or amount of the transaction. It therefore appears that the tax is targeted towards the generator of the waste. *See, Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 2017, 119 L.Ed.2d 121 (1992). However, Chem Waste did record this tax as revenue to the facility from 1988 to 1990 but did not include it in the royalty calculation. In 1990. Chem Waste began recording the taxes as a liability. (Ex. 77, Sch D–2).

The Court concludes that although the tax appears analogous to a sales or excise tax, Chem Waste treated these funds as revenues. Accordingly, the Court concludes the funds collected for payment of the Alabama hazardous waste taxes are revenue to the Emelle facility for purposes of the royalty calculation. Plaintiffs are therefore entitled to their 12 1/2% royalty on these revenues.

(10) **Revenues Transferred to Non–Facility Records.** In this category Mr. Shannon identified one million seven hundred ninety-eight thousand seven hundred and fifty dollars ($1,798,750) in deductions from Emelle's revenues where there was no corresponding entry crediting that amount to any account on Emelle's books. (Tr. 1230; Ex. 77, Schs. E and E–1). Ms.

Scudder testified that because Emelle became a "cost center" during this time, Mr. Shannon would not have seen the corresponding entries. (Tr. 2294). Plaintiffs' counsel did request an explanation for these transactions from defense counsel. (Tr. 1232–36; Ex. 80). Defense counsel was able to account for six of the items but gave no further information as to the other entries. (Tr. 1232, 1235–36; Ex. 81). In addition, Ms. Scudder did not identify the remaining deductions from revenue or explain them.

The Court concludes Plaintiffs proved by a preponderance of the evidence that these revenues were related to the operations of Emelle and should therefore be included in the royalty calculations.

(11) **Intra/Inter Company Pricing Differences.**[18] Because of the events surrounding this dispute, Mr. Shannon was asked to look for possible price differences between intra/intercompany charges and third party companies. Both Dr. Henson, Chem Waste's expert in hazardous waste disposal and manager of Emelle for a number of years, and Mark Gregory testified that Chem Waste would normally give its related or sister companies a ten percent (10%) discount for services provided by Emelle. This discount was apparently designed to help Chem Waste's related companies capture waste in the market and secure this waste for disposal at the Emelle facility.[19] Defendant's accounting expert, Eileen Scudder, indicated that she had been provided documentation suggesting a 10%, and sometimes larger, discount was given on competitively bid special projects.

On the other hand, Mr. Shannon concluded from his analysis that the price differential was substantially more than ten percent. According to his analysis, the inter/intracompany pricing ranged from 34 to 59 percent below third party pricing. (Tr. 1154). In addition, Mr. Shannon was of the opinion that this pricing difference accounted for $20,886,834 in unrecognized revenues for Emelle from 1992 to May 31, 1995. (Tr. 1149–51; Ex. 77, Sch E, E–2, and E–2A).

Mr. Shannon's conclusion of preferential pricing was supported in part by a pricing schedule obtained through discovery dated March 11, 1994. (Ex. 73, pg.1). The schedule outlined total all-in costs for a particular service, an intercompany price and a third party price. (Tr. 1143–59, Ex. 73). That price list indicated that the intercompany price was substantially lower than the third party price and was often the same as or just above the total "all-in" costs. (Ex. 73).

Ms. Scudder testified however that the price list only pertained to "base" business and not special projects or event business which is competitively bid.[20] Regardless of which type of business the price list pertains to, it is highly indicative that Chem Waste was giving or intended to give its related companies more than a ten percent discount compared to third party companies on "base" business. Chem Waste also argued that Mr. Shannon's figures did not reflect any actual revenues to Emelle and that under proper accounting procedures inter/intracompany charges could, if disclosed, be recognized at a nominal costs of one cent or at no costs at all. In addition, Chem Waste claimed that because the agreement did not specify that intercompany charges had to be accounted for at market rates, it did not breach the

---

**18.** Intracompany represents revenues from other divisions of Chem Waste, and intercompany includes entities distinct from Chem Waste but affiliated or associated with the Waste Management family of companies. (Tr. 1143).

**19.** Chem Waste apparently required its related companies to dispose of hazardous waste materials captured in the market place at Chem Waste or other Waste Management owned or controlled facilities.

**20.** Base Business is the recurring business that comes through the gate at Emelle from established customers. (Tr. 1237, 2266),

agreement by giving intercompany discounts. These arguments clearly miss the point.

■ The agreement provided that Plaintiffs are entitled to 12 1/2% of Emelle's revenues. The Court concludes the parties intended the revenues to be based on the fair market value for the services provided by the operations of the facility. If Chem Waste were allowed to artificially lower the amount of revenues by charging lower prices to related companies, this in turn would artificially lower Plaintiffs' royalty payments. The Court finds that charging lower intra/intercompany prices compared to third party prices violated both the payment and maximization provisions of the purchase agreement. Following Defendant's argument to its logical conclusion, Chem Waste could avoid paying any royalties to Plaintiffs simply by limiting itself to providing services for related companies, and then accounting for or charging those transactions at no costs at all.

Mr. Shannon based his calculations on a "sampling" of invoices from third party companies sending waste to Emelle and then comparing the average third party price with the average intercompany price and applying that difference to the volume of intercompany waste for a given period. (Tr. 1150–60, 1245–53; Ex. 77, Sch. E–2A). Ms. Scudder challenged this procedures on the basis that Mr. Shannon failed to look at all the TSCA[21] accounts and did not look at any RCRA[22] accounts. (Tr. 2273–77). Chem Waste also argued that Mr. Shannon's analysis was flawed because his projections were based on partial samples of Emelle's invoices and did not account for special projects. Furthermore, Chem Waste submitted some documentation that all remediation companies are given the same bid price for handling this waste

except for the ten percent discount as indicated above.

The Court rejects all of Defendant's above contentions. The Court concludes that Mr. Shannon did consider TSCA versus RCRA waste pricing. (Tr. 1246–53). Moreover, Ms. Scudder's calculations were limited to 1992 and, even under her analysis, intercompany prices were on average twenty-two percent (22%) lower than prices for third parties on special event or bid business for 1992. (Tr. 2373–74, Ex. 123, Tab 14, pg. 5). Furthermore, Ms. Scudder testified that she found the pricing differential to be irrelevant for purposes of the all revenue purchase agreement language. (Tr. 2370–71). This statement indicates to the Court that Ms. Scudder either failed to understand the issue or intentionally chose to ignore its relevance. The Court concludes Mr. Shannon's analysis provided the most reliable and persuasive review of Emelle's finances as to the royalty payment provision of the contract and Plaintiffs' damages. The Court therefore finds Plaintiffs are entitled to 12 1/2% royalty on $20,886,834 which represents the loss of revenue due to Defendant's pricing differential.

## B. Total of Excluded Revenues

Chem Waste reported to Plaintiffs that the Emelle facility generated six hundred ninety-five million five hundred thirty-two thousand three hundred and seven dollars in revenue ($695,532,307), excluding transportation revenues, from 1981 to 1992. Chem Waste made royalty payments to Plaintiffs from 1981 to 1992 equal to twelve and one-half percent of this figure or eighty-six million nine hundred forty-one thousand five hundred and forty dollars ($86,941,540). Chem Waste did not make any royalty payments to Plaintiffs for the years 1993, 1994 and 1995. The proof at trial demonstrated that the Emelle facility

**21.** The Toxic Substance Control Act—hazardous waste controlled and governed under this Act.

**22.** The Resource Conservation Recovery Act—waste governed and controlled by this Act.

recognized sixty-two million two hundred sixty-two thousand five hundred and fifteen dollars ($62,262,515) for 1993; fifty-seven million nine hundred ninety-nine thousand four hundred and fifty-four dollars ($57,999,454) for 1994; and seventeen million three hundred twenty-seven thousand six hundred and seventy-two dollars ($17,327,672) in revenue up to May 31, 1995.

Adding the above excluded revenue categories as identified by Mr. Shannon back into the reported revenue figures for the Emelle facility, as well as the 1993, 1994 and 1995 revenues, equals one billion fifteen million six hundred fifty-eight thousand four hundred and ninety-four dollars ($1,015,658,494) in revenues for the years 1981 to May 31, 1995. (Ex. 77, Schedule F). Twelve and one-half percent (12 1/2%) of this amount equals $126,957,312. (Ex. 77, Schedule F).[23] The evidence demonstrated that Chem Waste made royalty payments to Plaintiffs for the time period in question in the amount of $86,941,540. (Ex. 77, Schedule F). The Court finds Plaintiffs are therefore owed an additional forty million fifteen thousand seven hundred and seventy-two dollars ($40,015,772) as the present value of the royalty payment they are due on their excluded revenues claim. (Ex. 77, Schedule A). The Court also finds Plaintiffs should recover prejudgment interest at Alabama's statutory rate of 6% interest from September 15 of the year in which the lost contract payment was due through June 30, 1995, totaling five million nine hundred forty-six thousand seven hundred and thirty-seven dollars ($5,946,737). (Ex. 77, Schedule A). Plaintiffs are therefore entitled to forty-five million nine hundred sixty-two thousand five hundred and nine dollars ($45,-962,509) on their underpayment claim. (Ex. 77, Tab 1, Schedule A).

### C. Failure to Maximize Revenues

Mr. Hagerman gave his expert opinion that Emelle lost $ 225,112,685 in revenue

from 1987 to 1998 based on Chem Waste's failure to have the Chalk Kiln and RCRA incinerators operating at the Emelle facility. Mr. Shannon calculated 12 1/2% of this amount to be $28,139,086. (Ex. 77, Schedule G). Mr. Shannon further stated that the present value of $28,139,086 using statutory rates is $21,625,050. (Ex. 77, Schedules A & G). The Court finds Plaintiffs are entitled to $21,625,050 on their maximization claim plus prejudgment interest in the amount of eight million nine hundred two thousand seven hundred and ninety-three dollars ($8,902,793) for a total of thirty million five hundred twenty-seven thousand eight hundred and forty-three dollars ($30,527,843) on this claim. (Ex. 77, Tab 1, Schedule A).

### D. Plaintiffs' Total Contract Damages

The Court finds plaintiff are entitled to present value contract damages including prejudgment interest through June 30, 1995, of seventy-six million four hundred and ninety thousand three hundred and fifty-two dollars ($76,490,352) based on Defendant's breach of the quarterly payment provision and maximization provision of the purchase agreement. (Ex. 77, Tab 1, Sch A).

### CONCLUSIONS OF LAW

### I. Jurisdiction and Venue.

The Court concludes it has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(a)(1). Venue appears proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(3). (*See*, Def.'s Prop. Find. pg. 23 & Ans.Amend.Compl. pg. 3).

### II. Choice of Law.

 In a diversity action, the district court is obligated to apply the choice of law rules of the state in which it sits. *Security Insurance Company v. Tucker & Associates*, 64 F.3d 1001, 1005 (6th Cir. 1995) *citing, Anderson Dev. Co. v. Travel-*

---

**23.** The figures were rounded to the nearest dollar amount.

ers Indem. Co., 49 F.3d 1128, 1131 (6th Cir.1995). For contract claims, Tennessee follows the principle "that a contract is presumed to be made with reference to the law of the place where it was entered into unless it appears that it was entered into in good faith with reference to the law of some other state." *Charles Craft, Inc. v. Camel Manufacturing Co.*, 1995 WL 350434 (Tenn.App. June 12, 1995) *quoting*, *Deaton v. Vise*, 186 Tenn. 364, 210 S.W.2d 665 (1948). In the present case, the contract was entered into in Alabama. In addition, paragraph 14.10 of the Agreement states that "[t]he Agreement shall be construed in accordance with the laws of the State of Alabama." (Ex. 1, pg.61). Both sides agreed and the Court concludes that Alabama law should apply to the contract claims. However, Defendant urges the Court to apply Tennessee law to the tort or fraud claims.

■■■ Tennessee has adopted the most significant relationship approach to conflicts of law questions involving tort claims. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn.1992). Under this approach, the Court is to consider: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, etc. of the parties; and (d) the place where the relationship, if any, between the parties is centered. *Id.* These contacts are to be evaluated according to their relative importance with respect to the particular issue. *Id.*

■■■ The injury in this case occurred in Tennessee, Alabama and Florida as Plaintiffs reside in these states. The conduct causing the injury took place at the Emelle facility in Alabama. It appears from the evidence in the record that the exclusions and deductions from the facility's revenues took place in Alabama. The parties are located in Tennessee, Alabama, Florida and Illinois. However, it is clear to the Court that the business relationship of the parties is centered around the facility at Emelle, Alabama.

Evaluating the above contacts according to their relative importance as to the fraud claims, the Court concludes that the place where the conduct causing the injury and the place where the relationship between the parties is centered are relatively more important than the other contacts. Accordingly, the Court is of the opinion that the fraud claims are centered in Alabama, and Alabama has the most significant relationship to these claims. Therefore, the Court concludes Alabama law should govern as to the fraud claims.

### III. Chemical Waste's Non–Party Defense.

Chem Waste argues in its revised proposed findings of facts that it cannot be found to have breached the purchase agreement as it was never a party to the agreement. The Court disagrees. The Court finds Chem Waste is a party to this agreement based on its answer to the amended complaint, its corporate affiliation, ownership, operation of the site, and its actions and dealings with Plaintiffs. (Ans.Am.Compl., pg.9).[24]

### IV. Chem Waste's Statute of Limitations Defense.

■■■ Both sides recognize Alabama has a six year statute of limitations for contract actions. Ala.Code. § 6–2–34. Chem Waste maintains that Plaintiffs' breach of contract claim is time barred because the

---

24. Chem Waste admits "it entered into the agreement in good faith and ... performed under the Agreement in good faith." (Ans.Am.Compl., pg.9). Defendant's argument here that it is not a party to the agreement is very disconcerting to the Court. This defense was not pursued until after the trial of this case. If Chem Waste intended to pursue this defense, it should have been brought to the Court's attention for decision before the Court spent eleven days in trial and expended a considerable amount of judicial resources on this case. Defendant raised every other available defense—the Court cannot imagine Defendant was unaware of this defense.

breach, if any, occurred when the exclusions were made more than six years before the date that this action. Alabama Code § 6–5–280 provides that

> If a contract is entire, only one action can be commenced for breach thereof; but if it is severable or if the breaches occur at successive periods in an entire contract, as where money is to be paid by installments, an action will lie for each breach; provided, that all the breaches occurring up to the commencement of the action must be included therein.

The Court finds the contract to be severable and Plaintiffs may recover for each breach for failure to make the quarterly installment payments or royalty payments in accordance with paragraph 2.1(b)(i) of the agreement. Therefore, Plaintiffs may recover for each breach of paragraph 2.1(b)(i) of the contract that accrued within six years prior to commencement of this action. *See, Blythe v. Embry,* 36 Ala.App. 596, 61 So.2d 142, 143 (1952).

■ Chem Waste then argues that because Plaintiffs' revenue calculations are not broken down into pre-April 15 and post-April 15 transactions, Plaintiffs can only recover, if at all, on those revenues from January 1, 1988, to present to avoid considering any claim for revenues barred by the statute of limitations. Defendant assumes that the breach, if any, for the first quarter of 1987 occurred before April 15, 1987, when the exclusions were made. Plaintiffs on the other hand contend that because the payment for the first quarter of 1987 was not due until April 30, 1987, Defendant did not breach paragraph 2.1(b)(i) for the first quarter 1987 revenues until they were due, April 30, 1987. Plaintiffs therefore maintain the 1987 first quarter revenues are not time barred.

■ Under Alabama law, a "breach consists of the failure without legal excuse to perform any promise forming the whole or part of the contract. Where the defendant has agreed under the contract to do a particular thing, there is a breach and the right of action is complete upon his failure to do the particular thing he agreed to do." *Stephens v. Creel,* 429 So.2d 278, 281 (Ala. 1983), *citing, Seybold v. Magnolia Land Co.,* 376 So.2d 1083, 1085 (Ala.1979). In addition, a statute of limitations begins to run from the time the cause of action accrues, and the cause of action accrues as soon as the party is entitled to maintain an action thereon. *See, Garrett v. Raytheon Co.,* 368 So.2d 516, 518 (Ala.1979).

The Court concludes Plaintiffs could not have maintained an action on the first quarter 1987 royalty payment until that payment was due and Defendant failed to make that payment in accordance with the terms of the agreement. The 1987 first quarter royalty payment was not due until thirty days after the end of the quarter, i.e. April 30, 1987. Accordingly, Plaintiffs' cause of action for the 1987 first quarter payment did not accrue until April 30, 1987. Plaintiffs filed this action on April 15, 1993. Therefore, the Court finds Plaintiffs' claim for the 1987 first quarter payment are not time barred by Alabama's statute of limitations.

■ Chem Waste also contends Plaintiffs' fraud claims are barred by Tennessee's three year statute of limitations. As indicated earlier, the Court has concluded that Alabama law should govern the fraud claims. Alabama has a two year statute of limitations for fraud claims and a tolling provision that allows the filing of a claim within two years of the time the plaintiff discovered or reasonably should have discovered the cause of action. Alabama Code §§ 6–2–3, 6–2–38 (1975).

As part of its defense to the fraud allegations, Chem Waste asserts Plaintiffs became aware of or should have discovered the exclusions as early as 1978–1979 and certainly no later than April 3, 1990, as to the Alabama disposal taxes. Therefore, under Alabama law, the fraud claims would have to have been filed no later that April 3, 1992. Chem Waste points out that Mark Gregory, as General Manager of the

site, had access to and read the monthly operating reports (MOR) which showed the royalty was sometimes less than 12 1/2%. Defendant claims Gregory and the other Plaintiffs were therefore put on notice of the exclusions.

Gregory testified he was general manager for the site until 1980, and then he became both general and regional manager for Chem Waste. In 1981, Roger Henson became the general manager for the site and Gregory worked as regional manager only. Gregory also indicated his office was located at the facility until 1983 when he moved it to Livingston, Alabama. Gregory testified that he was no longer responsible for the Emelle facility in a managerial capacity beginning in 1985. (Tr. 426–28). In addition, Gregory indicated that he was more involved with the operational side of the facility than the financial side. However, he further stated that he was responsible for the bottom line profit of the facility and region in his positions as general and regional manager. (Tr. 429).

On cross examination, Gregory stated that he looked at the monthly operating reports from time to time. He also admitted he looked at the royalty calculation on some occasions. (Tr. 435). However, Gregory was not asked nor did he testify that he ever read or looked at the royalty calculations on the monthly reports submitted by Chem Waste where it indicates the royalty is less than 12 1/2%. (Tr. 424–442). Moreover, the monthly reports appear to have been routed to Roger Henson, as general manager of the facility at that time. The reports do not indicate they were routed to Gregory and, in fact, stopped going to Gregory on a regional level for some reason in 1983 or 1984. (Tr. 432).

The monthly operating reports do indicate the royalty as a percentage of the facility's total revenue. (Collective Ex. 89). The royalty was calculated to be 12.1% for April of 1985; 12.5% for December 1982; 12.4% for November of 1982; 11.6% for September of 1982 and 12.4% for May of 1982. (Tr. 434, Collective Ex. 89, last page of each report, fourth line from bottom). The first page of the 1982 reports also indicates that revenue attributable to the Vulcanus project. Accordingly, the Vulcanus revenues, which Plaintiffs' agreed to exclude from the royalty calculation, could therefore explain why the royalty equaled less than 12 1/2% of the facility's revenues in the 1982 MOR reports.

More importantly however, the Court is of the opinion that the 1982 monthly operating reports conclusively prove Chem Waste *did not* believe or can genuinely argue that the payment language of the purchase agreement limited the royalty to "disposal" revenues for waste actually buried or land-filled but in fact included *all* revenues from the facility. (Ex. 89, pg. 1 ea. section). This is because for each month on the 1982 MOR's the facility's revenues are broken down into twelve categories including: incineration, PCB waste, intercompany revenue and off-site work revenues. (Collective Ex. 89, pg 1 ea. section). The total revenues for the facility for each month includes all the categories listed except any Vulcanus revenues or transportation. (Collective Ex. 89, pg 1 ea. section). Then, by comparing the facility's total revenue figure (minus any Vulcanus revenues) for the months of March, April, May, July, August, October, November and December of 1982 from the monthly operating reports with the "disposal" revenue figure contained in the quarterly statements sent to Plaintiffs for that same time period, indicates the figures match to the dollar. (Compare Collective Ex. 89, pg 1 ea. section with Ex. 4). Accordingly, in 1982, it is clear that Chem Waste included incineration, PCB waste, intercompany and off-site work revenues in its definition of "disposal" revenue. (Collective Ex. 89, Ex. 4 and 5, Tab 1982).[25]

---

25. It therefore becomes clear beyond question that both Plaintiffs and Chem Waste interpret-

Only the September 1982 revenue figure from the MOR fails to match the September royalty statement figure sent to Plaintiffs. The September 1982 MOR figure differed by $165,803 from the September 1982 quarterly statement. This amount was attributable to capacitor revenue. The controller for Emelle at that time, Jim Phillips, in a 1982 memo to Jim Koenig, Chem Waste President, indicated that Mark Gregory "informally agreed" to this exclusion from the royalty calculation. (Ex. 13). Gregory confirms that he did speak with Phillips and talked about the capacitors. Gregory also stated that he thought he told Phillips he would probably agree to exclude the capacitor revenue as they were simply taken off a truck at Emelle and put on another truck for shipment to another facility for processing and disposal. (Tr. 437). However, it appears Defendant never sought such a formal exclusion for this revenue as it did in the case of the Vulcanus revenue and other capacitor revenue shown of the revenue summaries for 1979. (Ex. 4 and 5).

Based on the evidence adduced as to this issue, the Court concludes Plaintiffs were not aware of any exclusions or deductions from the facility's revenues due them other than the exclusions to which they agreed. In addition, Chem Waste did not present credible evidence that any of the Plaintiffs were made sufficiently aware of or reasonably should have known of the exclusions until one of the secret 1992 exclusion pages was sent to Plaintiffs apparently by mistake by an unknown Chem Waste employee. (Tr. 488). Accordingly, the Court finds Plaintiffs' fraud claims are not time barred. The Court also finds Plaintiffs may recover damages occurring as early as 1981 based on its findings that Chem Waste defrauded Plaintiffs of royal-

ty payments since 1981 and those damages are not barred by the statute of limitation for fraud actions under Alabama law.

## V. Interpretation of the Payment Language under Paragraph 2.1(b)(i).

At trial, Chem Waste sought to draw a distinction between "on-site" activity, i.e. those revenues generated by operations that physically take place on the permitted property described in Scheduled G and "off-site" revenues, i.e. revenues generated by operations taking place somewhere other than the Emelle facility, for purposes of the royalty calculation. The Court rejects this distinction.

Judge McRae ruled that paragraph 2.1(b)(i) covers *all revenues from all operations of the Emelle facility under any permits issued to the facility.* (emphasis added). This Court did not change, modify or alter Judge McRae's interpretation of paragraph 2.1(b)(i) in any way nor did it intend to suggest any other interpretation of paragraph 2.1(b)(i). This Court's reference to "*all revenues* from the *operation on the area of land described in Scheduled G* " was not intended to limit the royalty calculation only to those revenues generated by operations physically taking place within the area described by the legal description of the property. The Court referenced the legal description of the property in an attempt to address Defendant's misplaced emphasis on the terms "landfill site." The Court is further convinced after hearing the testimony in this case, Plaintiffs are entitled to installment payments equal to 12 1/2% of all revenues from all operations or activities of the Emelle facility under any permits issued to the facility.[26] The Court therefore ex-

ed the term "disposal" as used in the quarterly statements to mean all revenue except transportation. Defendant's argument to the contrary appears spurious.

**26.** The above interpretation also appears consistent with Frank Krohn's interpretation of paragraph 2.1(b)(i)—"if [revenues] incident to

operation of hazardous waste landfill site ... should be included in 12 1/2% of revenues"—in his response to Jim Koenig's 1981 memo about the royalty payment. (Tr. Vol.II, pgs. 168–72, Tr. Ex. 11–12). Frank Krohn at that time was vice president and general counsel for Chem Waste.

pressly reaffirms it Orders of December 1994 and April 1995.

## VI. Punitive Damages.

During the trial of this case, it became crystal clear to this Court, based upon the totality of the evidence in the record, that Defendant's top corporate officers decided upon and followed a well defined plan to cheat Plaintiffs out of money rightfully due them under the terms of the purchase agreement for the Emelle hazardous waste disposal facility. Nothing more—nothing less. What is troubling about this case is that fraud, misrepresentation and dishonesty apparently became part of the operating culture of the Defendant corporation. Even more so, Defendant and its corporate officers apparently refused to recognize their duties as required by the totally unambiguous contract. That being the case, the Court is of the opinion that Defendant and its corporate officers may best understand and appreciate money, and in this case, the loss of it.

Punitive Damages:

Alabama provides for the award of punitive damages "where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Alabama Code § 6–11–20 (1975). The Court finds Defendant, through its top corporate officers, consciously and deliberately engaged in fraud and misrepresentation towards Plaintiffs. Under Alabama law, in making an award of punitive damages in non-jury cases, the Court should considered the following criteria:

(1) The punitive damages should bear a relationship to the harm that is likely to occur from the defendant's conduct as well as the harm that has actually occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency or similar past conduct should all be relevant in determining the degree of reprehensibility.

(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

(4) The financial position of the defendant would be relevant.

(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

*Green Oil v. Hornsby*, 539 So.2d 218, 223 (Ala.1989). In addition, as briefed by the parties, the Court is also to consider several constitutional limitations when making an award of punitive damages as outlined by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

The Court recognizes that the "likely and actual harm" in this case was limited to monetary losses—notably in the millions of dollars. Without question, the record shows that Defendant knew its actions were fraudulent and through fraud and misrepresentation concealed its actions from Plaintiffs for a number of years. In addition, Defendant chose not to take any corrective action even when informed of its improper accounting by its own outside accounting firm.

Based on the award of contract damages, Defendant should not realize any profits from its fraudulent conduct. The contract damages also include revenues excluded from the royalty calculation for 1981 to remove any gain by Defendant for

that period. Defendant's financial position with respect to this facility was clearly set out during the course of this litigation. Furthermore, based on the Court's award of attorneys' fees and costs in accordance with the terms of the contract, the costs of litigating this matter will not be born by Plaintiffs.

The Court finds Defendant fraudulently excluded the following amounts from the royalty payment calculations from 1981 to 1992: truck wash fees, $377,880; lab fees, $3,638,683; Wilsonville/Denver revenues, $4,307,503; contra-expense incinerator ash revenues, $1,995,558; 1992 recalculation revenues, $8,332,847; non-reported revenues, $1,270,492; Emelle waste processing revenues, $126.811; PCB waste revenues, $17,144,852; and intra/intercompany price differential revenues of $ 6,997,294.[27] (See, Ex. 77, Tabs 2–6). These revenues total $44,191,920. Twelve and one-half percent of $44,191,920 equals $5,523,990. The Court is of the opinion that punitive damages in this case should be approximately three times this figure.

■ Accordingly, after considering the above relevant factors and the constitutional limitations outlined by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), as well as the amount of revenue generated by the Emelle facility as reported by Chem Waste for the first five months of 1995, (Ex. 77, Tab 2), the Court is of the opinion that punitive damages should be and are hereby fixed and awarded in the amount of fifteen million dollars ($15,000,000.00) This amount is approximately three times the amount of money Defendant actually defrauded Plaintiffs during the period of 1981 to 1992. The Court's determination as to the size of this award is based in large part on several factors present in this case. First, the Court perceives Defendant's conduct

as particularly reprehensible based on the lack of any necessity for such fraud in light of the amount of revenues being generated by the Emelle facility. There was no reason whatsoever for Defendant to undertake such conduct other than greed. Second, Defendant's conduct extended over a significant period of time and involved high ranking corporate officers. Third, Defendant undertook significant steps to conceal and cover-up its fraud. Lastly, the Court is of the opinion that the size of this award is necessary in order to perhaps get Defendant and its officers' attention. As indicated, it seems Defendant and its corporate officers still believe that they did not do anything wrong. In this Court's opinion, the punitive damage award represents a fair and reasonable punishment for Defendant's conduct based on the totality of the circumstances in this case.

## VII. Defendant's Counterclaim

Based on the Court's findings in this case, it is clear that Defendant's counterclaim is without merit. Accordingly, it is dismissed with prejudice.

## VIII. Attorneys' Fees and Costs.

Both Plaintiffs and Defendant have requested an award of attorneys' fees and costs in accordance with Paragraph 14.7 of the purchase agreement. The Court finds Defendant's actions necessitated Plaintiffs filing this lawsuit in order to enforce their rights under the purchase agreement. The Court denies Defendant's request for an award of attorneys' fees for the reasons stated in this opinion.

Defendant opposes Plaintiffs' counsel's request for attorneys' fees on the grounds that (1) Plaintiffs are not the prevailing party, (2) there was no risk to Plaintiffs' counsels that they will not be paid if they did not prevail, (3) Plaintiffs' counsels' affidavits constitute impermissible hearsay in

---

27. The state hazardous waste disposal fee revenues totaling $ 111,322,847 were not considered in determining the amount of damages sustained by Plaintiffs due to Defendant's fraud. Defendant has a legitimate argument that the parties never intended to include these revenues in the royalty payment calculations.

violation of Rule 802 of the Federal Rules of Evidence preventing Defendant from proper cross-examination of the matters raised therein, (4) the information in the affidavits is insufficient to support an award, and (5) there is no legal basis to award Plaintiffs a flat 15 to 20% of recovery fee award.

Attorneys' fees are an element of damages that in a diversity action are to be awarded on the basis of substantive state law. *In re Sure–Snap Corp.*, 983 F.2d 1015, 1017 (11th Cir.1993); *Cf., Tiedel v. Northwestern Michigan College*, 865 F.2d 88, 92 (6th Cir.1988) (In a typical diversity case, attorneys' fees should be awarded only if authorized under state law. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975)). In *Lanier v. Moore–Handley, Inc.*, 575 So.2d 83, 85 (Ala.1991), the Alabama Supreme Court stated that "[t]he reasonableness of an attorney fee under a contract providing for the recovery of reasonable attorney fees is largely within the discretion of the trial court." The *Lanier* Court also listed twelve factors that the trial court should consider when awarding attorneys' fees. They are: (1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances. *Id. citing, Peebles v. Miley*, 439 So.2d 137, 140–41 (Ala. 1983). Although all of these criteria need not support the amount awarded—indeed, rarely would all 12 criteria be applicable in a case—they are available for the trial court to consider in connection with each claim for an award of attorneys' fees. *Graddick v. First Farmers & Merchants National Bank of Troy*, 453 So.2d 1305, 1313 (Ala.1984).

The present case represents a difficult, tedious, and contentious breach of contract, fraud and misrepresentation dispute. The case obviously required considerable resources to prosecute. Plaintiffs' attorneys performed their task with the necessary expertise and effort to succeed in this case. Defense counsel argued every available position and zealously represented their client.

Based on all of the above and the entire record in this case, the Court concludes Plaintiffs should recover all costs associated with bringing this action and attorneys' fees calculated at a reasonable hourly rate based on the time actually spent. The Court makes this determination because the award of attorneys' fees is for the most part based on the contract between the parties. The Court is of the opinion that when the parties entered into the agreement they intended "reasonable attorneys' fees" to be calculated on an hourly basis. If the parties to this dispute switched positions, the Court believes Plaintiffs would argue for a hourly fee rate instead of a percentage of recovery award. Although attorneys' fees can be a part of a punitive damage award to promote bringing wrongdoers to trial, the Court feels it is unnecessary in this case because the size of the punitive damages award.

Plaintiffs' attorneys and their expert witnesses have submitted affidavits of the time and costs expended on this case. However, these affidavits do not present a clear summary upon which the Court and defense counsel can determine the total legal/expert fees and expenses charged to Plaintiffs, the time involved for the services provided and the person(s) performing the services. Accordingly, the Court requests Plaintiffs' attorneys to submit a clear and concise summary indicating the

total legal costs incurred by Plaintiffs to bring this action, a break down of those costs and expenses, and the hourly rates charged by the various attorneys within thirty (30) days from the date of this opinion.

## IX. Pending Motions.

Defendant's motion to strike the affidavits of Plaintiffs' attorneys in support of an award of attorneys' fees (Filed July 12, 1995, Docket entry no. 182) is denied. Defense counsel may submit any objections to Plaintiffs' counsel attorneys' fees and expense summary and/or documentation within thirty (30) days after its submission.

Defendant's motion to strike the expert testimony of William O. Hagerman and to strike the incineration exhibits, Exhibit 54, (Filed July 12, 1995, Docket entry no 184) is denied. Defendant's objections only go to the weight of Hagerman's testimony.

Defendant's motion for judgment pursuant to Rule 52(c) of the Federal Rules of Civil Procedure (Filed July 12, 1995, Docket entry no 186) is denied.

Defendant's motion to strike Plaintiffs' counter deposition designations of William Hagerman dated November 1994, (Filed August 4, 1995, Docket entry no. 197) is denied as moot. The Court did not rely on any designated deposition excerpts tendered after the trial in reaching its decision.

Plaintiffs' motion for judgment (Filed August 24, 1995, Docket entry no. 200) is granted in accordance with this opinion.

Defendant's motion for an award of attorneys' fees and expenses (Filed August 24, 1995, docket entry no. 209) is denied.

Defendant's motion for judgment (Filed August 24, 1995, Docket entry no. 212) is denied.

## X. Conclusion.

The Court finds that Plaintiffs established by a preponderance of the evidence that the Defendant Chemical Waste Management, Inc., breached the payment provision, paragraph 2.1(b)(i), and the maximization provision, paragraph 6.11, of the purchase agreement as alleged in Count I of the amended complaint. The Court also finds that Plaintiffs established by clear and convincing evidence that Defendant defrauded Plaintiffs by knowingly and intentionally misrepresenting and suppressing material facts as alleged in Counts II and III of the amended complaint. The Court therefore orders the following:

1. Plaintiffs are hereby awarded, in accordance with the calculations of Mr. Shannon, the present value of their contract damages through June 30, 1995, including pre-judgment interest, totaling seventy-six million, four hundred ninety thousand, three hundred and fifty-two dollars ($76,490,-352.00) for Count I. (Ex. 77, Tab 1, Sch A). Plaintiffs are also entitled to any royalties that have accrued since June 30, 1995.

2. Plaintiffs are hereby awarded fifteen million dollars ($15,000,000.00) in punitive damages for Counts II and III.

3. Plaintiffs are hereby awarded attorneys' fees and costs on an hourly basis. This award will be made once Plaintiffs have submitted a summary of their attorneys' fees and costs and Defendant has had an opportunity to respond.

4. Defendant is ordered to comply in good faith with all of the requirements of the contract and to operate the Emelle hazardous waste site to its maximum capacity throughout the facility's economically useful life. Defendant is also ordered to pay the costs of an annual financial audit of the Emelle facility's revenues as well as a review and evaluation of the facility's operation by an expert in the field of hazardous waste treatment and disposal operations. The annual financial audit and the expert's evaluation shall be delivered to Plaintiffs or their representative

no later than the last Monday of each July. Plaintiffs may, if necessary, petition the Court for appropriate review to ensure compliance with the provisions of this order.

5. Judgement is entered against the Defendant on its counterclaim for alleged overpayment of royalties to Plaintiffs on the contract.

### Schedule of Plaintiffs' Damages

| | |
|---|---|
| "All" revenue as reported by Chem Waste 1981 to 1992 | $ 695,532,307.00 |
| Reported Revenues × royalty percentage ($ 695,532,307 × 12.5%) | 86,941,538.00 |
| Royalty Payments Actually made 1981 to 1992 | 86,941,540.00 |
| Defendant made no royalty payments from 1993–1995 | |

Excluded revenues identified by Mr. Shannon through May 31, 1995:

| | |
|---|---|
| Truck wash fees | $ 392,043.00 |
| Lab fees | 4,537,289.00 |
| Wilsonville/Denver Project | 4,307,503.00 |
| Incinerator Ash | 1,995,558.00 |
| Recalculation/Reduction of Revenue | 8,332,847.00 |
| Other revenue recorded but not reported | 1,270,492.00 |
| Waste processed at Emelle but not reported | 6,399,419.00 |
| PCB Waste revenue | 21,292,964.00 |
| Alabama Hazardous Waste Disposal Fee | 111,322,847.00 |
| Revenues transferred to non-facility records | 1,798,750.00 |
| Differences between intra/intercompany prices | + 20,886,834.00 |
| | |
| Total of Excluded Revenues Identified by Shannon | $182,536,546.00 |
| | |
| Chem Waste reported revenues 1981 – 1992 | 695,532,307.00 |
| Total of Excluded Revenues Identified by Shannon | 182,536,546.00 |
| Emelle 1993 Revenues | 62,262,515.00 |
| Emelle 1994 Revenues | 57,999,454.00 |
| | |
| Emelle 1995 Revenues through May 31, 1995 | + 17,327,672.00 |
| | |
| Total Emelle Revenues 1981 to May 31, 1995 | $1,015,658,494.00 |
| | |
| Total Royalty Due Plaintiffs ($ 1,015,658,494.00 × 12.5%) (1981 to May 31, 1995) | = $ 126,957,312.00 |
| | |
| Total Royalty Payments Due Plaintiffs | $ 126,957,312.00 |
| Minus Royalty Payments Actually Made | − 86,941,540.00 |
| Total of Additional Royalties Due Plaintiffs Under Paragraph 2.1 of the Purchase Agreement | $ 40,015,772.00 |
| | |
| Pre-judgment Interest | + $ 5,946,737.00 |
| | |
| **Total Damages from Exclusion of Revenues** | $ 45,962,509.00 |
| | |
| Lost Revenues for Failure to Maximize 1987 to 1998 | $ 225,112,685.00 |
| Present Value of Royalty Due Plaintiffs Under Paragraph 6.11 (Lost Revenues × 12.5%) | $ 21,625,050.00 |
| | |
| Pre-judgment Interest | + $ 8,902,793.00 |
| | |
| **Total Damages from Failure to Maximize** | $ 30,527,843.00 |
| | |
| **Total Damages from Exclusion** | $ 45,962,509.00 |

Total Damages from Failure to Maximize + $ 30,527,843.00

Total Contract Damages $ 76,490,352.00

Total Punitive Damages + $ 15,000,000.00

Total Damages* $ 91,490,352,00

*(The Total Damages figure does not include attorneys' fees and costs which are to be awarded later and any royalties that have accrued since June 30, 1995 to date and continue under the terms of the contract. Damage figures were rounded to the nearest whole dollar amount).